UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

JOSEPH BRADFIELD and
PATRICIA BRADFIELD,

      Plaintiffs,

Case No: 5:13-cv-222-WTH-PRL

vs.

MID-CONTINENT CASUALTY COMPANY,

      Defendant.
_____/

## MID-CONTINENT'S AMENDED MOTION FOR SUMMARY JUDGMENT REGARDING HORGO SIGNATURE HOMES

Pursuant to Federal Rule of Civil Procedure 56, Mid-Continent Casualty Company ("MCC") moves for summary judgment against Joseph and Patricia Bradfield. For the reasons stated below, this Court should grant this motion and hold MCC had no duty to defend or indemnify Horgo Signature Homes ("Horgo"), who is not an insured under any MCC policy.

### STATEMENT OF UNDISPUTED MATERIAL FACTS

When Richard Higo moved to the United States in 2003 he formed Horgo Enterprises to buy and sell foreclosed homes so that he could have a visa. Higo, Page 8, ln. 6-8, Page 11, ln. 4-16.[1] Eventually the purpose of Horgo Enterprises changed to building custom homes. *See* Higo, Page 16, ln. 3-11. A few years after Horgo Enterprises' incorporation Horgo Signature Homes was formed and its purpose was building custom homes. *See* Higo, Page 18, ln. 20-24. Mr. Higo did not dissolve Horgo Enterprises when Horgo Signature Homes was formed because he needed it to maintain his visa. *See* Higo, Page 28, ln. 5-8. After Horgo Signature Homes was

---

[1] Mr. Higo's Deposition Pages are attached as Exhibit "A."

formed Horgo Enterprises consequently continued to be a "running business" that entered into contracts and paid taxes. *See* Higo, Page 28, ln. 24-Page 29, ln. 2 and Page 30, ln. 2-6. Horgo Signature Homes and Horgo Enterprises never entered into written contracts with each other nor did Horgo Enterprises ever enter into an agreement stating it would indemnify Horgo Signature Homes. *See* Higo, Page 125, ln. 9-16, Higo, Page 126, ln. 8-11, Horvath, Page 159, ln. 14-16.[2]

Mr. Horvath was responsible for obtaining insurance from MCC for Horgo Enterprises which included completing the insurance application. *See* Horvath, Page 76, ln. 16-19 and Page 160, ln. 9-11. Higo, Page 15, ln. 17-Page 16, ln. 2. Higo never told Mr. Horvath to obtain insurance for Horgo Signature Homes. *See* Higo, Page 124, ln. 1-7. In addition, Higo never asked Mr. Horvath if he obtained insurance for Horgo Signature Homes. *See* Higo, Page 20, ln. 18-20, Nor did Mr. Horvath ever tell Mr. Higo that Mr. Horvath obtained insurance for Horgo Signature Homes. Higo, Page 20, ln. 23. In fact, Mr. Higo never spoke with anyone to find out if Mr. Horvath obtained insurance for Horgo Signature Homes. *See* Higo, Page 20, ln. 24-Page 21, ln. 1. Mr. Higo has never even seen any of the insurance policies MCC issued to Horgo Enterprises, *See* Higo, Page 122, ln. 8-15. Nor has he ever seen any certificates of insurance issued on behalf of Horgo Enterprises or Horgo Signature Homes. Higo, Page 204, ln. 7-9. Mr. Higo also has no knowledge of anyone ever asking Mid-Continent to list Horgo Signature Homes as an additional insured and contacting Mid-Continent to insure Horgo Signature Homes as that is not something he would have done. *See* Higo, Page 204, ln. 24-Page 205, ln. 5, P. 224, ln. 20-P. 225, ln. 6. Mr. Higo simply believes Horgo Signature Homes was insured under Horgo Enterprises' policies because Horgo Signature Homes built homes. *See* Higo, P. 123, ln. 18-25.

As of the time of his deposition, Mr. Horvath did not believe Horgo Signature Homes had

---

[2] Mr. Horvath's deposition pages are attached as Exhibit "B."

liability insurance.  *See* Horvath, Page 19, ln. 2-10.  The absence of liability insurance is why Mr. Horvath wanted Winfree Homes and not Horgo Signature Homes to build the Bradfields' house.  *See* Horvath, Page 19, ln. 5-10.  Mr. Higo asked Mr. Winfree if Horgo Signature Homes could use Winfree Homes' insurance when building homes but Mr. Winfree said no.  *See* Winfree, Page 40, ln. 9-17.[3]  Even then no attempt was made to insure Horgo Signature Homes.

Although Mr. Winfree would not agree to allow Horgo Signature Homes to use Winfree Homes' insurance, Mr. Winfree orally agreed he would go into business with Horgo Signature Homes to build homes, including the Bradfield's home.  *See* Winfree, Page 47, ln. 23-Page 48, ln. 16.  Pursuant to that oral agreement, Mr. Winfree shared profits with Horgo Signature Homes.  *See* Winfree, P. 30, ln. 24-P. 31, ln. 9.  Winfree Homes did not have any written contracts with Horgo Signature Homes or Horgo Enterprises.  *See* Winfree, Page 46, ln. 25-Page 47, ln. 12.

To assist the joint venture between Winfree Homes and Horgo Signature Homes, on June 30, 2005, Mr. Winfree gave a power of attorney to Mr. Higo.  *See* Winfree, Page 27, ln. 15-Page 28, ln. 9.[4]  The power of attorney allowed Mr. Higo to apply for permits and pay Lake County fees through Winfree Homes.  *See* Winfree, Page 27, ln. 15-18, Page 28, ln. 3-9.  Since Mr. Higo had the power of attorney he served as Winfree Homes' superintendent.  *See* Winfree, Page 49, ln. 1-11, Page 49, ln. 21-Page 50, ln. 7 and Page 120, ln. 11-15.

Mr. Winfree testified that his responsibility was to "build the home" because he "was the permit holder, [he] got [he] signed for the permit."  Winfree, Page 19, ln. 3-10.  He therefore remained the residential general contractor until Lake County issued the certificate of occupancy for the Bradfield's home on December 13, 2006.[5]  *See* Winfree, Page 30, ln. 24-Page 31, ln. 15.

---

[3] Mr. Winfree's deposition pages are attached as Exhibit "C."
[4] The power of attorney is attached as Exhibit "D."
[5] The certificate of occupancy is attached as Exhibit "E."

Higo, Page 57, ln. 16-19 and Page 63, ln. 3-7.

Dr. Bradfield first heard of Horgo Signature Homes from his dentist, Mrs. Horvath and subsequently entered into a contract[6] with that company to construct the house that is the subject of this litigation. *See* Dr. Bradfield, Page 9, ln. 2-4. [7] The house's construction "was not [Mrs. Bradfields'] first rodeo." She has "built other homes" "redone other homes" and hired other contractors as part of those other construction projects. *See* Mrs. Bradfield, Page 49, ln. 1-24.[8] On a daily basis Mrs. Bradfield was very involved in her home's construction, went to the construction site and also reviewed the plans. *See* Horvath, P. 50, ln. 4-17.

The Bradfields moved into the house just before Christmas of 2006. *See* Dr. Bradfield, Page 20, ln. 1-4. Within 30 days of moving in contractors recaulked the windows and a portion of the garage ceiling came down and was replaced for the first of three times. *See* Dr. Bradfield, Page 41, ln. 15-Page 42, ln. 20. The first time he saw water intrusion through the balcony was when the garage ceiling was torn out in 2007. *See* Dr. Bradfield, Page 63, ln. 20-Page 64, ln. 3.

He believes that around two years after they moved into the house they had the pool, pool deck and pool bath built by a company other than Horgo Signature Homes or Winfree Homes. *See* Dr. Bradfield, Page 18, ln. 5-8, Page 18, ln. 1-4, Page 18, ln. 15-24, Page 19, n. 10-16. The pool deck has sagging pavers. *See* Dr. Bradfield, Page 18, ln. 25-Page 19, ln. 2

Dr. Bradfield observed many construction defects at the house. For example, within a year of moving in he noticed the summer kitchen was constructed with the wrong type of wood and was improperly sealed. *See* Dr. Bradfield, Page 77, ln. 21-Page 78, ln. 9. Similarly, the front porch sloped towards the house which allowed water to enter the house. *See* Dr. Bradfield,

---

[6] The contract is attached as Exhibit "G."
[7] Dr. Bradfield's deposition pages from the deposition he gave in this action are attached as Exhibit "F."
[8] Mrs. Bradfield's deposition pages are attached as Exhibit "H."

Page 64, ln. 18-Page 65, ln. 10.  Even though the front door has been leaking for many years, he took no steps to mitigate that damage.  *See* Dr. Bradfield, P. 15, ln. 1-19-22-P. 16, ln. 3.

Dr. Bradfield believes his roof is missing hurricane clips.  *See* Dr. Bradfield Pride USA lawsuit, Page 27, ln. 3-6.  Despite the missing clips, the only time the roof damaged their house was in January of 2007.  *See* Dr. Bradfield Pride USA lawsuit, Page 15, ln. 9-15.[9]  That leak and its resulting damages were resolved by Pride USA before the Bradfields sued Horgo Signature Homes and Winfree Homes.  *See* Dr. Bradfield Pride USA lawsuit, Page 15, ln. 21-25, Page 16, ln. 1-13 and Page 27, ln. 23-Page 28, ln. 4.  *See* Horvath, Page 53, ln. 14-19 and Page 60, ln. 19-Page 61, ln. 2.  There were consequently no outstanding issues related to the sole water intrusion caused by the roof.  *See* Dr. Bradfield Pride USA lawsuit, Page 16, ln. 10-13.  The Bradfields subsequently entered into a $30,000 settlement agreement with the roofing company for all damages allegedly related to the roof.  *See* the Settlement Agreement with Pride USA.[10]

Dr. Bradfield also testified that five windows in the dining room and exercise room have problems.  *See* Dr. Bradfield, Page 72, ln. 21-Page 73, ln. 7.  Although one of their experts, Mr. Clark, (without the benefit of any testing) believes all of the windows were improperly installed, Dr. Bradfield has not seen any reports to support Clark's assumption and does not know if all of the windows are improperly installed.  *See* Dr. Bradfield, Page 72, ln. 9-15.

Page 3 of the 2013 consent judgment[11] states it ratifies the settlement agreement[12] and page 3 of the settlement agreement incorporates the 2012 report the Bradfields' expert, Mr.

---

[9] Dr. Bradfield's deposition pages from the action the Bradfields brought against the roofer are attached as Exhibit "I."
[10] The settlement agreement the Bradfields entered into with the roofer is attached as Exhibit "J."
[11] The consent judgment is attached as Exhibit "K."
[12] The settlement agreement between the Bradfields, Horgo Signature Homes and Winfree Homes is attached as Exhibit "L."

Swidler, prepared while working at the Endeavor Group.[13] Dr. Bradfield however testified that he also does not know if the consent judgment contains amounts for items in Mr. Swidler's report like repairing and properly installing all of the windows, fixing the summer kitchen, removing and re-elevate the pool deck's slope, installing a drain for the pool deck, remediating the property from mold, of fixing the air handler's closet, which Mr. Swidler believes needs to have the plywood removed. *See* Dr. Bradfield, Page 116, ln. 5-7, Page 115, ln. 11-15, Page 74, ln. 10-Page 75, ln. 1, Page 79, ln. 20-23, Page 116, ln. 21-Page 117, ln. 11. Page 10 of the settlement agreement states it is for $671,050 plus fees of $20,333.55 and costs of $$4,724.45 but Dr. Bradfield does not know if $671,050 of the $696,108 consent judgment is for the items on Mr. Swidler's 2012 estimate, which is also for $671,050.[14] *See* Dr. Bradfield, Page 93, ln. 9-11. After giving that testimony Dr. Bradfield was instructed not to answer any other questions about the consent judgment's amount. *See* Dr. Bradfield, Page 121, ln. 18-Page 122, ln. 2.

Similar to her husband, Mrs. Bradfield asserted the attorney client privilege when asked whether she relied on Swidler's December 13, 2012, estimate for $671,050 when entering into the consent judgment. Mrs. Bradfield also said she does not know what amounts were included within the $671,050 that comprises the non-attorney's fees and costs part of the $696,108 consent judgment. *See* Mrs. Bradfield, Page 89, ln. 24-Page 90, ln. 9-17. For example, she did not know if the consent judgment included an amount to fix the air handler, which was installed one year after the certificate occupancy by a company other than Horgo Signature Homes and Winfree Homes. *See* Mrs. Bradfield, Page 59, ln. 5-12, Page 60, ln. 15-Page 61, ln. 3. Page. 61, ln 11-14. Likewise, Mrs. Bradfield does not know if the consent judgment contains an amount for items in Mr. Swidler's 2012 report like removing the summer kitchen's allegedly

---

[13] Mr. Swidler's report is attached as Exhibit "M."
[14] Mr. Swidler's estimate is attached as Exhibit "N."

combustible materials, removing and replacing defective drywall or nonconforming drywall, reelevating the pool deck, fix the front porch's slope, installing a drain, replacing the roof, or mitigating for mold. *See* Mrs. Bradfield, Page 61, ln. 19-24, Page 62, ln. 7-14; Page 69, ln 10-Page 70, ln. 2, Page 102, ln. 3-5, Page 91, ln. 3-5, Page 53, ln. 3-5.

Mr. Higo, who was Horgo Signature Homes' head, does not know what mechanical or electrical work is needed at the house, how the windows should be fixed or whether there are problems with the hardwood floors, paint, carpeting, roof, paving, tile or block to frame wall. *See* Higo, Page 143, ln. 19-20 and Page 144, ln. 8-11, Page 145, ln. 3-6, Page 150, ln. 17-25, Page 153, ln. 8-10, Page 153, ln. 15-24, Page 154, ln. 5-7, Page 138, ln. 23-Page 139, ln. 6, Page 139, ln. 10-15. He did not even review the house's job file after the Bradfields sued Horgo Signature Homes and Winfree Homes. *See* Higo, Page 170, ln. 4-11.

During Mr. Higo's deposition the Bradfields' counsel objected to "allocation of damages, settlement discussions regarding that and/or the contents of the mediation, reasonableness as to why the Defendant, in this case Winfree Homes . . . and Horgo Signature Homes agreed to the terms thereof." Higo, Page 130, ln. 22-Page 131, ln. 8. Mr. Higo then testified he does not know what part of the consent judgment is allocated for items on Mr. Swidler's estimate like the HVAC's demolition, the removal of hardwood floors, carpeting, tile, insulation, interior drywall, paving, painting and removing and reinstalling tubs, cabinets and vanities. *See* Higo, Page 141, ln. 19-23, Page 143, ln. 7-11, Page 144, ln. 4-7, Page 145, ln. 25-Page 146, ln. 3 and Page 146, ln. 10-13, Page 148, ln. 7-11, Page 148, ln. 15-18, Page 149, ln. 13-18, Page 149, ln 19-23, Page 151, ln. 4-22, Page 154, ln. 2-4. Finally he did not know what was allocated to repair the stucco window returns, the block to frame wall or to rectify building code violations. *See* Higo, Page 153, ln. 3-7, Page 246, ln. 4-17.

Likewise Mr. Winfree lacked knowledge about the Bradfields' alleged damages and did not review the job file or construction records before entering into the settlement agreement and consent judgment. *See* Winfree, Page 38, ln. 16-18. On his attorney's advice, Mr. Winfree has not been to the Bradfields' house since Lake County issued the certificate of occupancy in 2006. *See* Winfree, Page 71, ln. 25-Page 72, ln. 2, Page 84, ln. 12-17 and P. 134, ln. 3-10. Mr. Winfree is therefore unaware of any problems at the home and has no idea whether the Bradfields' allegations regarding the drywall and summer kitchen are accurate. *See* Winfree, P. 106, ln. 4-7, P. 107, ln. 22-25, P. 124, ln. 18-P. 125, ln. 4, Page 130, ln. 9-11, and P. 105, ln. 11-15.

The Bradfields' counsel even objected to the question of whether the settlement agreement was entered into to resolve the issues in the Bradfields' complaint against Horgo Signature Homes and Winfree Homes. *See* Winfree, Page 94, ln. 7-21. Mr. Winfree's counsel then refused to allow Mr. Winfree to answer whether Winfree Homes entered into the settlement agreement to resolve all issues raised in the complaint brought by the Bradfields against Winfree Homes and Horgo Signature Homes and whether the settlement agreement contained amounts for items in Mr. Swidler's report even though that report is incorporated into the settlement agreement and is an exhibit to the complaint filed against Horgo Signature Homes and Winfree Homes. *See* Winfree, Page 97, ln. 13-21, Page 100, ln. 1, Page 101, ln. 4, Page 102, ln. 9-13, Page 106, ln. 15-Page 107, ln. 3, Page 108, ln. 1-21, Page 118, ln. 23-Page 119, ln. 6, P. 119, ln. 16-P. 120, ln. 9, P. 128, ln. 16-2, P. 130, ln. 12-17, P. 134, ln. 10-14, P. 98, ln. 16-Page 99, ln. 1.

Mr. Winfree also did not know how much it would cost to repair the construction defects at the Bradfields' house. *See* Winfree, Page 110, ln. 5-9. Although the Bradfields' and Mr. Winfree's counsel objected to Mr. Winfree testifying as why he believed the settlement agreement was for a reasonable amount, he nevertheless testified that without seeing the house

14924853v1 0946262

and calculating his own estimate he did not have an opinion as to how much it would cost to fix the house.. *See* Winfree, Page 111, ln 2-13, Page 182, ln. 21-Page 183, ln. 3.

Michael Swidler, who works part time at Disney World as a supervisor, was retained in 2012 by the Bradfields to inspect their property. *See* Swidler, Page 6, ln. 2-10; Page 11, ln. 18-25.[15] Based on that inspection he believes all of the damages at the Bradfields' house started "day one." Swidler, Page 25, ln. 20-Page 26, ln. 13. During his 2012 inspection he only observed buckling wood by the dining room, the game room and in the office. *See* Swidler, Page 31, ln. 8-21 and Page 32, ln. 10. Upon reviewing the pool bath and deck he determined that the pool bath is being damaged by the pool deck's pavers, which are too high. *See* Swidler, Page 32, ln. 25-Page 33, ln. 8, Page 48, ln. 25-Page 49, ln. 16. In the exercise room he saw a wet furring strip but did not take a moisture reading or sample of the wood to determine if the wood would still be useful after it dried out. *See* Swidler, Page 44, ln. 15-Page 45, ln. 20.

Derelle Inc. is a general contracting company run by Cecil Clark. *See* Clark, Page 6.[16] According to Mr. Clark, he usually hires his project's project managers instead of the homeowners hiring them. *See* Clark, Pages 11-12. Yet, even when a project manager is hired, Clark still makes sure the homeowners' expectations are met. *See* Clark, Page 10. Clark typically pays project managers ten percent and said very rarely would he ever pay a project manager more than ten percent. *See* Clark, Pages 13-14.

In 2012 Mr. Swidler asked Mr. Clark to prepare an estimate to remove and replace the entire interior of the Bradfields' house down to the studs. *See* Clark, Page 38, ln. 11-Page 39, ln. 21. Swidler told Clark that an estimate was needed that involved removing all of the drywall and the granite hard tops, and vanities. *See* Swidler, Page 132, lin. 10-16 and Page 137, ln. 4-10.

---

[15] Mr. Swidler's deposition pages are attached as Exhibit "O."
[16] Mr. Clark's deposition pages are attached as Exhibit "P."

9

Swidler also told Clark that the estimate needed to include the removal of the hardwood floor in all rooms even though a hallway, stairway and the master bedroom had undamaged hardwood floors. *See* Swidler, Page 141, ln. 3-9, Page 142, ln. 17-24 and Page 143, ln. 12-23. Swidler also asked Clark to include in the estimate an amount to remove and replace all of the carpeting because the carpeting might get damaged when construction occurs. *See* Swidler, Page 145, ln. 6-11. That request was made even though Swidler did not notice the carpeting's condition when he was at the house, did not perform any tests to determine if the carpeting was damaged and does not recall any manuals stating carpeting would have to be removed under these circumstances. *See* Swidler, Page 147, ln. 10-13, Page 148, ln. 13-21, Page 149, ln. 21-23, Page 153, ln. 23-Page 154, ln. 10. Another reason given by Swidler in an attempt to support his belief the carpeting needs to be removed is that the carpeting is in rooms with windows and potentially toxic drywall. However, he did not check the windows in the bedrooms to determine if they were defective and he did not take any samples of drywall from the ceilings in the bedrooms. *See* Swidler, Page 155, ln. 5-20, Page 156, ln. 24, Page 156, ln. 26-Page 157, ln. 23; Page 158, ln. 8-15. Swidler even admitted he is unaware of any scientific literature or studies supporting his opinion that all synthetic drywall is corrosive. *See* Swidler, Page 59, ln. 18-24. Swidler's unsupported belief that all synthetic drywall is corrosive and harms copper is the reason he believes it is necessary to spend $40,000 on plumbing but he admits to not having examined the house's copper items. *See* Swidler, Page 198, ln. 17-23 and Page 199, ln. 5-16. Swidler also asked for Clark's estimate to include an amount to remove the attic's insulation because of the drywall, which Swidler thought needed to be replaced because it was too thin. *See* Swidler, Page 178, ln. 18-Page 179, ln. 1. Swidler acknowledges he has not seen any wet insulation behind the second floor's walls. *See* Swidler, Page 181, ln. 11-18.

Turning to the tile, Swidler told Clark it all needed to be removed and replaced in the kitchen because he thought the drywall was toxic and corrosive. *See* Swidler, Page 160, ln. 25-Page 161, ln. 7. . He even thought the tile in the bathrooms needed to be removed and replaced even though he admits that he doesn't know if it is damaged and did not perform tests to see it there was moisture below the tiles. *See* Swidler, Page 163, ln 25, page 164, ln. 19, Page 172, ln. 1-14. Nor did he even perform a tap test of tile in the workout room, doesn't recall seeing damaged tile in the workout room or master bathroom and didn't even go into the bathroom underneath the stair to examine that room's tile and drywall. *See* Swidler, Page 168, ln. 5-15, Page 169, ln. 5-7, Page 170, ln. 24-Page 171, ln. 3.

In order to prepare the estimate Mr. Clark spent a few hours at the house. Based on his inspection, Clark believes all of the Bradfields' damages started when the windows were installed. *See* Clark, Page 46, ln. 13-25. Clark's estimate included amounts to remove mold. *See* Clark, Page 116, ln. 21-Page 117, ln. 23. In particular, Clark believes that the electric lighting demo, trim, garage door openers, cabinetry, appliance, hardwood floors, carpeting, tile, insulation crown base, drywall and doors all have to be removed because of mold. *See* Clark, Page 117, ln. 1-23. Clark also included in his estimate amounts for personal protection and to bag and dispose of everything that has come into contact with mold. *See* Clark P. 126, ln. 7-25, P. 211, ln. 9-P. 212, ln. 3. Clark's estimate lacked competitive bids for many items because Clark didn't want to waste the potential subcontractors' time. *See* Clark, P. 67, ln. 13-18.

Many of the line items in Clark's estimate are to repair construction defects. For instance, Clark testified his estimate includes an amount to remove and install windows because they are all installed improperly. *See* Clark, Page 221, ln. 8-Page 222, ln. 3. Clark also included $53,900 in his estimate to replace the entire roof because even though it doesn't leak, it is

11

missing hurricane clips. Other items included on Clark's estimate are to remove undamaged items such as the cabinets, carpeting, tiles, vanities, fixtures, and appliances. *See* Clark Page 153, ln. 16-24, 162, ln. 15-18, Page 163, ln. 9-12, Page 175, ln. 7-16; Page 178, ln. 16-Page 179, ln. 22, Page 78, ln. 5-10, Page 81, ln. 4-18, Page 84, ln. 1- Page 85, ln. 1, Page 89, ln. 18-25, Page 91, ln. 1-7, Page 91, ln. 22-25. Clark also believes that the insulation, which is not damaged, needs to be removed in the attic to look for mold and to install larger drywall because the current drywall. although undamaged does not comply with the plans. *See* Clark, Page 194, ln. 21- Page 195, ln. 9. Clark does not believe the carpeting or tiles are currently damaged but included in his estimate amounts to remove and replace those items. *See* Clark's first estimate.[17]

Also included on the estimate is a supervision fee of $27,000 and that includes Clark's project manage fee for Clark to hire someone to be at the property every single day making sure that everything is done according to the code, locking up the house at night, overseeing the subs and making sure the project's expectations are met. *See* Clark, Page 252, ln. 22-Page 253, ln. 14. After Clark prepared his estimate Mr. Swidler told Clark to include an amount for unforeseen damages. *See* Clark, Page 51, ln. 11-23. Clark consequently added $42,000 to his original estimate. *See* Clark, Page 135, ln. 14-Page 136, ln. 20.

After receiving Clark's second estimate,[18] Swidler took all of those numbers with the exception of the stucco and painting numbers and prepared his own estimate for $671,050, which included for painting, stucco and the balcony the number of Allan Lougheed, who is another one of the Bradfields' experts. Swidler believes the balcony's slope is defective construction and needs to be repaired which is why he included an amount in his estimate. *See* Swidler, Page 46, ln, 22-Page 47, ln. 11. Other amounts included on Swidler's estimate is an amount to replace the

---

[17] Clark's first estimate is attached as Exhibit "Q."
[18] Clark's second estimate is attached as Exhibit "R."

12

entire roof, which is not damaging other parts of the house but has missing tiles. *See* Swidler, Page 73, ln. 2-14; Page 113, line 2-17. Another repair that Swidler believes is needed to refinish the air handler, which Swidler also acknowledges is not damaging the rest of the house. *See* Swidler, Page 64, ln. 8-Page 65, ln. 15. Although the drywall is not damaging any portion of the house, Swidler believes that all of the drywall needed to be removed and replaced with other drywall because the installed drywall is too this and doesn't comply with the building code. *See* Swidler, Page 70, ln. 25-Page 71, ln. 23; Page 48, ln. 18-22, Page 40, ln. 17-19.

Swidler stated five times during his deposition that he included a management fee of 20% in his estimate. *See* Swidler, Page 232, ln. 23-Page 233, ln. 14, Page 235, ln. 20. However, he admits to not being aware of anyone else who charges a management fee of that amount or any manuals or regulations stating 20% is reasonable. *See* Swidler, Page 233, ln. 16-19, Page 235, ln. 15-22. More importantly, as stated in the expert report of Susan Domanski, Swidler's management fee is a service not typically provided for residential construction and, assuming it is required, would only be 4.5% to 7 % of construction costs according RSMeans.[19] The lack of needing a management fee is even more evident when considering that Mrs. Bradfield testified this isn't her "first rodeo" and she has built homes before. Plus, the only other time Swidler was hired to manage he was paid $5,000, which was less than 20%. *See* Swidler Page 235, ln. 22-Page 235, ln. 9. Plus, Mr. Clark testified that he already included a management fee in his estimate and Clark's management fee number was incorporated into Swidler's estimate.

Lougheed's $96,500 stucco estimate that was incorporated into Swidler's estimate includes the amount to reslope the improperly sloped sills. *See* Lougheed, Page 124, ln. 7-10 and

---

[19] The expert report of Susan Domanski is attached as Exhibit "S."

Page 124, ln. 23-Page 125, ln.1 and Page 125, ln. 3-13.[20] That $96,500 also includes $6,500 to fix the termination of the stucco at the band even though Lougheed did not check the band throughout the entire perimeter. *See* Lougheed, Page 125, ln. 2-18 and 23-25, Page 126, ln. 12-17 and Page 127, ln. 7-21. Finally, Lougheed included as part of his $96,500 stucco estimate $45,000 to install a midwall weep since he believed one was required under the contract and by code but absent. *See* Lougheed, Page 124, ln. 23-Page 125, ln. 25, Page 98, ln. 4-13. An amount to install a midwall weep was included even though Lougheed did not see damages caused by the absence of that item. *See* Lougheed, Page 98, ln. 20-Page 99, ln. 18. Even though Swidler incorporated Lougheed's estimate for stucco repair, he did not take out Clark's estimate to repair the defective stucco. *See* Swidler, Page 225, ln. 6-10.

## MEMORANDUM OF LAW

### I. Summary Judgment Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists and the mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 252 (1986).

### II. Horgo Signature Homes Is Not Insured Under Any MCC Policy

Count One of the Bradfields' complaint contends MCC breached an alleged duty to defend Horgo . However, Horgo  is not mentioned anywhere in the MCC policies. In fact the only relationship the Horgo Enterprises' policies have to the Bradfields' action is that when the

---

[20] Allan Lougheed's deposition pages are attached as Exhibit "T."

underlying action's settlement agreement and consent judgment were entered into, Richard Higo of Horgo Enterprises was assigning Horgo Signature Homes rights under MCC's policies to the Bradfields. Mr. Higo signed those documents even though he admitted under oath that he has never reviewed MCC's policies issued to Horgo Enterprises and he never asked Philip Horvath, who was the sole person in charge of filling out Horgo Enterprises' insurance application, to make sure that Mr. Horvath obtained insurance for Horgo Signature Homes. Also fatal to the Bradfields' lawsuit against MCC is that Mr. Higo admitted that no written contracts exist between Horgo Enterprises and Horgo Signature Homes.[21]

Examining Mr. Horvath's testimony is equally problematic to the Bradfields because Mr. Horvath admits he knowingly never obtained from MCC insurance for Horgo and he didn't even think Horgo had any liability coverage. According to Mr. Horvath, the very reason Horgo wanted Winfree Homes to be the general contractor is because under Florida law the general contractor is liable for the construction project, Winfree Homes had insurance and Horgo did not.

Despite the complete absence of any evidence supporting their position, the Bradfields' answers to MCC's interrogatories nevertheless stated that Horgo was an additional insured under MCC's policies. When questioned under oath they could not point to a single provision or endorsement in any of MCC's policies that supports their assertion. The reason for this is simple: examining MCC's additional insured endorsements and the policies' definition of an insured contract establishes Horgo can never qualify as an additional insured under any of the

---

[21] Since Horgo Enterprises was never sued by the Bradfields it never requested a defense from MCC. Since MCC never refused to defend Horgo Enterprises, it breached the conditions of MCC policies by assigning its rights, if any to the Bradfields. *American Reliance Ins. Co. v. Perez*, 712 So. 2d 1211 (Fla. 3d DCA 1998) (Because the insurer did not deny a defense, the insureds breached the cooperation provisions by assigning its rights in an unauthorized consent judgment); *First American Title Ins. Co. v. Nat'l Union Fire Ins. Co.*, 695 So. 2d 475 (Fla. 3d DCA 1997) (insurer was not bound by a unilateral settlement because it never denied a defense) and *U.S. Fire Ins. Co. v. Mikes*, 2007 WL 3046671, *1 (M.D. Fla. Oct. 16, 2007) (same),

MCC policies.[22]

According to MCC's plainly worded additional insured endorsements, which are ML 10 81 (03 01) and ML 10 81 (06 08), an additional insured is defined in bold as any person or organization for whom the named insured has agreed in a written "insured contract" to designate as an additional insured subject to all provisions and limitations of the MCC policies. The endorsements further require that the entity would only be an additional insured for damages caused in whole or in part by Horgo Enterprises' performance or ongoing operations that were done for the additional insured.

Under Florida law, the absence of a valid written insured contract prevents Horgo Signature Homes from ever qualifying as an additional insured under MCC's policies. *See United Rentals, Inc. v. Mid-Continent Cas. Co.*, 843 F. Supp. 2d 1309 (S.D. Fla. 2012) (holding United Rentals was not an additional insured under MCC's policies because there was no valid written insured contract and United Rentals was being sued for its own acts and omissions) and *Mid-Continent Cas. Co. v. Constr. Services & Consultants, Inc.*, No. 06-cv-80922, 2008 WL 896221 (S.D. Fla. Mar. 31, 2008) (holding a valid written insured contract between CSCI and Transeastern did not exist and MCC was not consequently not required to defend or indemnify Transeastern). Just as the Southern District held in *United Rentals* and *Constr. Services & Consultants, Inc.*, that the absence of a valid written insured contract eliminated coverage under MCC's policies, this Court should also hold that Horgo is not insured under MCC's policies issued to Horgo Enterprises, MCC did not breach its duty to defend Horgo and no coverage exists under the consent judgment for Horgo's alleged acts and omissions.

---

[22] The MCC policies issued to Horgo Enterprises are attached as Exhibit "U."

Respectfully submitted,

*s/*MELISSA A. GILLINOV
Ronald L. Kammer
Florida Bar No. 360589
rkammer@hinshawlaw.com
Melissa A. Gillinov
Florida Bar No. 011892
mgillinov@hinshawlaw.com
HINSHAW & CULBERTSON LLP
2525 Ponce de Leon Blvd., 4th Floor
Coral Gables, Florida 33134
Telephone: 305-358-7747
Facsimile: 305-577-1063
*Counsel for Mid-Continent Casualty Company*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2014, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/MELISSA A. GILLINOV
Melissa A. Gillinov