**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

JOSEPH BRADFIELD and
PATRICIA BRADFIELD,

        Plaintiffs,

                                  Case No: 5:13-cv-222-WTH-PRL

vs.

MID-CONTINENT CASUALTY COMPANY,

        Defendant.

_____/

## MCC'S AMENDED MOTION FOR SUMMARY JUDGMENT
## REGARDING WINFREE HOMES

Pursuant to Federal Rule of Civil Procedure 56, Mid-Continent Casualty Company ("MCC") moves for summary judgment against the Bradfields. For the reasons stated below, this Court should grant this motion and hold no coverage exists for the consent judgment.

### INTRODUCTION

MCC is entitled to the entry of judgment in its favor because (1) no coverage exists for the consent judgment because joint and several liability does not exist in Florida for the Bradfields' causes of action (2) no coverage exists for any damages because they are either excluded by j(5), j(6) or the mold endorsement, (3) the consent judgment is not allocated between covered and uncovered damages and (4) the Bradfields cannot establish the consent judgment was reasonable, entered into in good faith and not the product of collusion.

### STATEMENT OF UNDISPUTED MATERIAL FACTS

Mr. Winfree orally agreed Winfree Homes would go into business with Horgo Signature Homes to build homes, including the Bradfield's home. *See* Winfree, Page 47, ln. 23-Page 48, ln. 16. Pursuant to that oral agreement, Mr. Winfree shared profits with Horgo Signature Homes.

*See* Winfree, P. 30, ln. 24-P. 31, ln. 9. [1]  Winfree Homes did not have any written contracts with Horgo Signature Homes or Horgo Enterprises.  *See* Winfree, Page 46, ln. 25-Page 47, ln. 12.

On June 30, 2005, Mr. Winfree gave a power of attorney[2] to Mr. Higo. [3]  *See* Winfree, Page 27, ln. 15-Page 28, ln. 9.  The power of attorney allowed Mr. Higo to apply for permits and pay Lake County fees through Winfree Homes.  *See* Winfree, Page 27, ln. 15-18, Page 28, ln. 3-9.  Since Mr. Higo had the power of attorney he served as Winfree Homes' superintendent.  *See* Winfree, Page 49, ln. 1-11, Page 49, ln. 21-Page 50, ln. 7 and Page 120, ln. 11-15.

Mr. Winfree testified it was his responsibility to "build the home" because he "was the permit holder, [he] got [he] signed for the permit."  Winfree, P. 19, ln. 3-10.  Accordingly, he was the residential general contractor until Lake County issued the CO on December 13, 2006.[4]  *See* Winfree, Page 30, ln. 24-P. 31, ln. 15. Higo, P. 57, ln. 16-19 and P. 63, ln. 3-7.[5]

Dr. Bradfield first heard of Horgo Signature Homes from his dentist, Mrs. Horvath and subsequently entered into a contract[6] with that company to construct the house that is the subject of this litigation.  *See* Dr. Bradfield, Page 9, ln. 2-4.[7]  The house's construction "was not [Mrs. Bradfields'] first rodeo."  She has "built other homes" "redone other homes" and hired other contractors as part of those other construction projects.  *See* Mrs. Bradfield, Page 49, ln. 1-24.[8]  On a daily basis Mrs. Bradfield was very involved in her home's construction, went to the

---

[1] The deposition pages of Mr. Winfree are attached as Exhibit "C."
[2] The power of attorney is attached as Exhibit "D."
[3] The joint venture between Winfree Homes and Horgo Signature Homes was not disclosed to MCC when Winfree Homes applied for insurance.  *See* the MCC policies issued to Winfree Homes at [D.E. 32, Exhibit A].  For this additional reason there is no coverage under the Winfree policies. *See Kenneth Cole Prod., Inc. v. Mid-Continent Cas. Co.*, 2010 WL 5684403 (S.D. Fla. 2010) (holding no coverage existed under MCC's policy when the underlying lawsuit asserted damages were caused by a joint venture).
[4] The certificate of occupancy is attached as Exhibit "E."
[5] The deposition pages of Mr. Higo are attached as Exhibit "A."
[6] The contract is attached as Exhibit "G."
[7] The deposition pages of Dr. Bradfield from this lawsuit's deposition are attached as Exhibit "F."
[8] The deposition pages of Mrs. Bradfield are attached as Exhibit "H."

14924850v1 0946262

construction site and also reviewed the plans.  *See* Horvath, P. 50, ln. 4-17.[9]

The Bradfields moved into the house just before Christmas of 2006.  *See* Dr. Bradfield, Page 20, ln. 1-4.  Within 30 days of moving in contractors recaulked the windows and a portion of the garage ceiling came down and was replaced for the first of three times.  Exh F, Page 41, ln. 15-Page 42, ln. 20.  The first time he saw water intrusion through the balcony was when the garage ceiling was torn out in 2007.  Exh F, Page 63, ln. 20-Page  64, ln. 3.  Around two years after moving into the house they had the pool, pool deck and pool bath built by a company other than Horgo Signature Homes or Winfree Homes.  Exh F, P. 18, ln. 5-8, P. 18, ln. 1-4, P. 18, ln. 15-24, P. 19, n. 10-16.  The pool deck has sagging pavers.  Exh F, Page 18, ln. 25-Page 19, ln. 2

Dr. Bradfield observed many construction defects at the house.  For example, within a year of moving in he noticed the summer kitchen was constructed with the wrong wood and was improperly sealed.  *See* Dr. Bradfield, Page 77, ln. 21-Page 78, ln. 9.  Similarly, the front porch sloped towards the house which allowed water to enter the house.  Exh. F, Page 64, ln. 18-Page 65, ln. 10.  Even though the front door has been leaking for many years, he took no steps to mitigate that damage.  Exh F, P. 15, ln. 1-19-22-P. 16, ln. 3.

Dr. Bradfield believes his roof is missing hurricane clips.  *See* Dr. Bradfield Pride USA lawsuit, Page 27, ln. 3-6.  Despite the missing clips, the only time the roof damaged their house was in January of 2007.  Exh. I,, Page 15, ln. 9-15.[10]  That leak and its resulting damages were resolved by Pride USA before the Bradfields sued Horgo Signature Homes and Winfree Homes.  Exh. I, Page 15, ln. 21-25, Page 16, ln. 1-13 and Page 27, ln. 23-Page 28, ln. 4.  Exh. B, Page 53, ln. 14-19 and Page 60, ln. 19-Page 61, ln. 2.  There were consequently no outstanding issues related to the sole water intrusion caused by the roof.  Exh. I, Page 16, ln. 10-13.  The Bradfields

---

[9] The deposition pages of Mr. Horvath are attached as Exhibit "B."

[10] The deposition pages of Dr. Bradfield's testimony in his lawsuit  against the roofer are attached as Exhibit "I."

3

subsequently entered into a $30,000 settlement agreement with the roofing company for all damages allegedly related to the roof.  *See* the Settlement Agreement with Pride USA.[11]

Dr. Bradfield also testified that five windows in the dining room and exercise room have problems.  Exh F, Page 72, ln. 21-P. 73, ln. 7.  Although Mr. Clark (without the benefit of any testing) believes all of the windows were improperly installed, Dr. Bradfield has not seen any reports to support  Clark's assumption and does not know if all of the windows are improperly installed.  Exh. F, P. 72, ln. 9-15.

Page 3 of the 2013 consent judgment[12] states it ratifies the settlement agreement[13] and page 3 of the settlement agreement incorporates the 2012 report the Bradfields' expert, Mr. Swidler, prepared while working at the Endeavor Group.[14]  Dr. Bradfield however testified that he also does not know if the consent judgment contains amounts for items in Mr. Swidler's report like repairing and properly installing all of the windows, fixing the summer kitchen, removing and re-elevate the pool deck's slope, installing a drain for the pool deck, remediating the property from mold, of fixing the air handler's closet, which Mr. Swidler believes needs to have the plywood removed.  Exh. F, P. 116, ln. 5-7, P. 115, ln. 11-15, P. 74, ln. 10-P. 75, ln. 1, P. 79, ln. 20-23, P. 116, ln. 21-P. 117, ln. 11.  Page 10 of the settlement agreement states it is for $671,050 plus fees of $20,333.55 and costs of $$4,724.45 but Dr. Bradfield does not know if the $671,050 represents Swidler's 2012 estimate, which is also for $671,050.[15]  Exh. F, Page 93, ln. 9-11.  After giving that testimony Dr. Bradfield was instructed not to answer any other questions about the consent judgment's amount.  Exh. F., Page 121, ln. 18-Page 122, ln. 2.

Similar to her husband, Mrs. Bradfield asserted the attorney client privilege when asked

---

[11] The settlement agreement between the Bradfields and the roofer is attached as Exhibit "L."
[12] The consent judgment is attached as Exhibit "K."
[13] The settlement agreement between the Bradfields, Horgo Signature Homes and Winfree Homes is Exhibit "L."
[14] Mr. Swidler's report is attached as Exhibit "M."
[15] Mr. Swidler's estimate is attached as Exhibit "O."

4

whether she relied on Swidler's December 13, 2012, estimate for $671,050 when entering into the consent judgment. Mrs. Bradfield also said she does not know what amounts were included within the $671,050 that comprises the non-attorney's fees and costs part of the $696,108 consent judgment. Exh. H., Page 89, ln. 24-P. 90, ln. 9-17. For example, she did not know if the consent judgment included an amount to fix the air handler, which was installed one year after the certificate occupancy by a company other than Horgo Signature Homes and Winfree Homes. Exh. H., Page 59, ln. 5-12, Page 60, ln. 15-Page 61, ln. 3. Page. 61, ln 11-14. Likewise, Mrs. Bradfield does not know if the consent judgment contains amounts for items in Mr. Swidler's 2012 report like removing the summer kitchen's allegedly combustible materials, removing and replacing defective drywall or nonconforming drywall, reelevating the pool deck, fixing the front porch's slope, installing a drain, replacing the roof, or mitigating for mold. Exh. H., P. 61, ln. 19-24, P. 62, ln. 7-14; P. 69, ln 10-Page 70, ln. 2, P. 102, ln. 3-5, P. 91, ln. 3-5, P. 53, ln. 3-5.

Mr. Higo, who was Horgo Signature Homes' head, does not know what mechanical or electrical work the house needs or whether there are problems with the hardwood floors, paint, carpeting, roof, paving, tile or block to frame wall. *See* Higo, Page 143, ln. 19-20 and P. 144, ln. 8-11, Page 145, ln. 3-6, Page 150, ln. 17-25, Page 153, ln. 8-10, Page 153, ln. 15-24, Page 154, ln. 5-7, Page 138, ln. 23-Page 139, ln. 6, Page 139, ln. 10-15. He did not even review the house's job file after the Bradfields sued Horgo Signature Homes. *See* Higo, Page 170, ln. 4-11.

During Mr. Higo's deposition the Bradfields' counsel objected to "allocation of damages, settlement discussions regarding that and/or the contents of the mediation, reasonableness as to why the Defendant, in this case Winfree Homes . . . and Horgo Signature Homes agreed to the terms thereof." Higo, Page 130, ln. 22-Page 131, ln. 8. Mr. Higo then testified he does not know what part of the consent judgment is allocated for items on Mr. Swidler's estimate like the HVAC's demolition, the removal of hardwood floors, carpeting, tile, insulation, interior drywall,

paving, painting and removing and reinstalling tubs, cabinets and vanities. *See* Higo, P. 141, ln. 19-23, P. 143, ln. 7-11, P. 144, ln. 4-7, P. 145, ln. 25-P. 146, ln. 3 and P. 146, ln. 10-13, P. 148, ln. 7-11, P. 148, ln. 15-18, P. 149, ln. 13-18, Page 149, ln 19-23, P. 151, ln. 4-22, P. 154, ln. 2-4. Finally he did not know what was allocated to repair the stucco window returns, the block to frame wall or to rectify building code violations. *See* Higo, P. 153, ln. 3-7, P. 246, ln. 4-17.

Likewise Mr. Winfree lacked knowledge about the Bradfields' alleged damages and did not review the job file or construction records before entering into the settlement agreement and consent judgment. *See* Winfree, Page 38, ln. 16-18. On his attorney's advice, Mr. Winfree has not been to the Bradfields' house since Lake County issued the certificate of occupancy in 2006. Exh C., P. 71, ln. 25-P. 72, ln. 2, P. 84, ln. 12-17 and P. 134, ln. 3-10. Mr. Winfree is therefore unaware of any problems at the home and has no idea whether the Bradfields' allegations regarding the drywall and summer kitchen are accurate. *See* Exh. C, P. 106, ln. 4-7, P. 107, ln. 22-25, P. 124, ln. 18-P. 125, ln. 4, P. 130, ln. 9-11, and P. 105, ln. 11-15.

The Bradfields' counsel even objected to the question of whether the settlement agreement was entered into to resolve the issues in the Bradfields' complaint against Horgo Signature Homes and Winfree Homes. *See* Winfree, Page 94, ln. 7-21. Mr. Winfree's counsel then refused to allow Mr. Winfree to answer whether Winfree Homes entered into the settlement agreement to resolve all issues raised in the complaint brought by the Bradfields against Winfree Homes and Horgo Signature Homes and whether the settlement agreement contained amounts for items in Mr. Swidler's report even though that report is incorporated into the settlement agreement and is an exhibit to the complaint filed against Horgo Signature Homes and Winfree Homes. *See* Winfree, Page 97, ln. 13-21, Page 100, ln. 1, Page 101, ln. 4, Page 102, ln. 9-13, Page 106, ln. 15-Page 107, ln. 3, Page 108, ln. 1-21, Page 118, ln. 23-Page 119, ln. 6, P. 119, ln. 16-P. 120, ln. 9, P. 128, ln. 16-2, P. 130, ln. 12-17, P. 134, ln. 10-14, P. 98, ln. 16-Page 99, ln. 1.

14924850v1 0946262

Mr. Winfree also did not know how much it would cost to repair the construction defects at the Bradfields' house.  *See* Winfree, Page 110, ln. 5-9.  Although the Bradfields' and Mr. Winfree's counsel objected to Mr. Winfree testifying as why he believed the settlement agreement was for a reasonable amount, he nevertheless testified that without seeing the house and calculating his own estimate  he did not have an opinion as to how much it would cost to fix the house.  *See* Winfree, Page 111, ln 2-13, Page 182, ln. 21-Page 183, ln. 3.

Michael Swidler, who works part time at Disney World as a supervisor, was retained in 2012 by the Bradfields to inspect their property.  *See* Swidler, Page 6, ln. 2-10; Page 11, ln. 18-25.[16]  Based on that inspection he believes all of the damages at the Bradfields' house started "day one."  Swidler, Page 25, ln. 20-Page 26, ln. 13.  During his 2012 inspection he only observed buckling wood by the dining room, the game room and in the office.  *See* Swidler, Page 31, ln. 8-21 and Page 32, ln. 10.  Upon reviewing the pool bath and deck he determined that the pool bath is being damaged by the pool deck's pavers, which are too high.  *See* Swidler, Page 32, ln. 25-Page 33, ln. 8, Page 48, ln. 25-Page 49, ln. 16.  In the exercise room he saw a wet furring strip but did not take a moisture reading or sample of the wood to determine if the wood would still be useful after it dried out.  *See* Swidler, Page 44, ln. 15-Page 45, ln. 20.

Derelle Inc. is a general contracting company run by Cecil Clark.  *See* Clark, Page 6.[17] According to Mr. Clark, he usually hires his project's project managers instead of the homeowners hiring them.  *See* Clark, Pages 11-12. Yet, even when a project manager is hired, Clark still makes sure the homeowners' expectations are met.  *See* Clark, Page 10.  Clark typically pays project managers ten percent and said very rarely would he ever pay a project manager more than ten percent.  *See* Clark, Pages 13-14.

---

[16] Mr. Swidler's deposition pages are attached as Exhibit "O."
[17] Mr. Clark's deposition pages are attached as Exhibit "P."

14924850v1 0946262

In 2012 Mr. Swidler asked Mr. Clark to prepare an estimate to remove and replace the entire interior of the Bradfields' house down to the studs.  Exh P, Page 38, ln. 11-Page 39, ln. 21. Swidler told Clark that an estimate was needed that involved removing all of the drywall and the granite hard tops, and vanities.  Exh O, Page 132, lin. 10-16 and Page 137, ln. 4-10.  Swidler also told Clark that the estimate needed to include the removal of the hardwood floor in all rooms even though a hallway, stairway and the master bedroom had undamaged hardwood floors.  *See* Swidler, Page 141, ln. 3-9, Page 142, ln. 17-24 and Page 143, ln. 12-23.  Swidler also asked Clark to include in the estimate an amount to remove and replace all of the carpeting because the carpeting might get damaged when construction occurs.  *See* Swidler, Page 145, ln. 6-11.  That request was made even though Swidler did not notice the carpeting's condition when he was at the house, did not perform any tests to determine if the carpeting was damaged and does not recall any manuals stating carpeting would have to be removed under these circumstances.  Exh O, P 147, ln. 10-13, P 148, ln. 13-21, P 149, ln. 21-23, P 153, ln. 23-Page 154, ln. 10.  Another reason given by Swidler in an attempt to support his belief the carpeting needs to be removed is that the carpeting is in rooms with windows and potentially toxic drywall.  However, he did not check the windows in the bedrooms to determine if they were defective and he did not take any samples of drywall from the ceilings in the bedrooms.  Exh O, P 155, ln. 5-20, P 156, ln. 24, P 156, ln. 26-P 157, ln. 23; P 158, ln. 8-15.  Swidler even admitted he is unaware of scientific literature or  studies supporting his opinion that all synthetic drywall is corrosive.  Exh. O, P. 59, ln. 18-24.  The unsupported belief that all synthetic drywall harms copper is the reason he believes it is necessary to spend $40,000 on plumbing but he admits to not having examined the house's copper items.  Exh O, P. 198, ln. 17-23 and Page 199, ln. 5-16.  Swidler also asked for Clark's estimate to include an amount to remove the attic's insulation because of the drywall, which Swidler thought needed to be replaced because it was too thin.  Exh. O, P 178, ln. 18-P.

179, ln. 1.  Swidler acknowledges he has seen no wet insulation behind the second floor's walls. Exh O, P. 181, ln. 11-18.

Turning to the tile, Swidler told Clark it all needed to be removed and replaced in the kitchen because he thought the drywall was toxic and corrosive.  Exh O, P. 160, ln. 25-P. 161, ln. 7.  .  He even thought the tile in the bathrooms needed to be removed and replaced despite admitting he doesn't know if it is damaged and did not perform tests to see it there was moisture below the tiles.  Exh O, P. 163, ln 25, P. 164, ln. 19, P. 172, ln. 1-14.    Nor did he even perform a tap test of tile in the workout room, doesn't recall seeing damaged tile in the workout room or master bathroom and didn't even go into the bathroom underneath the stair to examine that room's tile and drywall.  Exh O, P. 168, ln. 5-15, P. 169, ln. 5-7, P. 170, ln. 24-P. 171, ln. 3.

In order to prepare the estimate Mr. Clark spent a few hours at the house.  Based on his inspection, Clark believes all of the Bradfields' damages started when the windows were installed.  *See* Clark, Page 46, ln. 13-25. Clark's estimate included amounts to remove mold.  *See* Clark, Page 116, ln. 21-Page 117, ln. 23. In particular, Clark believes that the electric lighting demo, trim, garage door openers, cabinetry, appliance, hardwood floors, carpeting, tile, insulation crown base, drywall and doors all have to be removed because of mold.  *See* Clark, Page 117, ln. 1-23.  Clark also included in his estimate amounts for personal protection and to bag and dispose of everything that has come into contact with mold.  *See* Clark P. 126, ln. 7-25, P. 211, ln. 9-P. 212, ln. 3. Clark's estimate that lacked competitive bids for many items because Clark didn't want to waste the potential subcontractors' time.  *See* Clark, P. 67, ln. 13-18.

Many of the line items in Clark's estimate are to repair construction defects.   For instance, Clark testified his estimate includes an amount to remove and install windows because they are all installed improperly.  *See* Clark, Page 221, ln. 8-Page 222, ln. 3.  Clark also included $53,900 in his estimate to replace the entire roof because even though it doesn't leak, it is

14924850v1 0946262

missing hurricane clips.   Other items included on Clark's estimate are to remove undamaged items such as the cabinets, carpeting, tiles, vanities, fixtures, and appliances.  *See* Clark Page 153, ln. 16-24, 162, ln. 15-18, Page 163, ln. 9-12, Page 175, ln. 7-16; Page 178, ln. 16-Page 179, ln. 22, Page 78, ln. 5-10, Page  81, ln. 4-18, Page 84, ln. 1- Page 85, ln. 1, Page 89, ln. 18-25, Page 91, ln. 1-7, Page 91, ln. 22-25.    Clark also believes that the insulation, which is not damaged, needs to be removed in the attic to look for mold and to install larger drywall because the current drywall. although undamaged does not comply with the plans.  *See* Clark, Page 194, ln. 21- Page 195, ln. 9.  Clark does not believe the carpeting or tiles are currently damaged but included in his estimate amounts to remove and replace those items.  *See* Clark's first estimate.

Also included on the estimate is a supervision fee of $27,000 and that includes Clark's project manage fee for Clark to hire someone to be at the property every single day making sure that everything is done according to the code, locking up the house at night, overseeing the subs and making sure the project's expectations are met.  Exh. P, Page 252, ln. 22-Page 253, ln. 14. After Clark prepared his estimate Mr. Swidler told Clark to include an amount for unforeseen damages.  Exh. P, Page 51, ln. 11-23.   Clark consequently added $42,000 to his original estimate.[18]  Exh P, Page 135, ln. 14-Page 136, ln. 20.

After receiving Clark's second estimate,[19] Swidler took all of those numbers with the exception of the stucco and painting numbers and prepared his own estimate for $671,050, which included for painting, stucco and the balcony the number of Allan Lougheed, who is another one of the Bradfields' experts.  Swidler believes the balcony's slope is defective construction and needs to be repaired which is why he included an amount in his estimate.  *See* Swidler, Page 46, ln, 22-Page 47, ln. 11.  Other amounts included on Swidler's estimate is an amount to replace the

---

[18] Mr. Clark's initial estimate is attached as Exhibit "Q."
[19] Mr. Clark's second estimate is attached as Exhibit "R."

14924850v1 0946262

entire roof, which is not damaging other parts of the house but has missing tiles.  *See* Swidler, Page 73, ln. 2-14; Page 113, line 2-17.  Another repair that Swidler believes is needed to refinish the air handler, which Swidler also acknowledges is not damaging the rest of the house.  *See* Swidler, Page 64, ln. 8-Page 65, ln. 15.  Although the drywall is not damaging any portion of the house, Swidler believes that all of the drywall needed to be removed and replaced with other drywall because the installed drywall is too this and doesn't comply with the building code.  *See* Swidler, Page 70, ln. 25-Page 71, ln. 23; Page 48, ln. 18-22, Page 40, ln. 17-19.

Swidler stated five times during his deposition that he included a management fee of 20% in his estimate.  *See* Swidler, Page 232, ln. 23-Page 233, ln. 14, Page 235, ln. 20.  However, he admits to not being aware of anyone else who charges a management fee of that amount or any manuals or regulations stating 20% is reasonable.  *See* Swidler, Page 233, ln. 16-19, Page 235, ln. 15-22.  More importantly, as stated in the expert report of Susan Domanski, Swidler's management fee is a service not typically provided for residential construction and, assuming it is required, would only be 4.5% to 7 % of construction costs according RSMeans.[20]  The lack of needing a management fee is even more evident when considering that Mrs. Bradfield testified this isn't her "first rodeo" and she has built homes before.  Plus, the only other time Swidler was hired to manage he was paid $5,000, which was less than 20%. *See* Swidler Page 235, ln. 22-Page 235, ln. 9.  Plus, Mr. Clark testified that he already included a management fee in his estimate and Clark's management fee number was incorporated into Swidler's estimate.

Lougheed's $96,500 stucco estimate that was incorporated into Swidler's estimate includes the amount to reslope the improperly sloped sills.  *See* Lougheed, Page 124, ln. 7-10 and Page 124, ln. 23-Page 125, ln.1 and Page 125, ln. 3-13.[21]  That $96,500 also includes $6,500 to

---

[20] Ms. Domanski's report is attached as Exhibit "S."
[21] Mr. Lougheed's deposition pages are attached as Exhibit "T."

14924850v1 0946262

fix the termination of the stucco at the band even though Lougheed did not check the band throughout the entire perimeter.  *See* Lougheed, Page 125, ln. 2-18 and 23-25, Page 126, ln. 12-17 and Page 127, ln. 7-21.  Finally, Lougheed included as part of his $96,500 stucco estimate $45,000 to install a midwall weep since he believed one was required under the contract and by code but absent.  *See* Lougheed, Page 124, ln. 23-Page 125, ln. 25, Page 98, ln. 4-13.  An amount to install a midwall weep was included even though Lougheed did not see damages caused by the absence of that item.  *See* Lougheed, Page 98, ln. 20-Page 99, ln. 18.  Even though Swidler incorporated Lougheed's estimate for stucco repair, he did not take out Clark's estimate to repair the defective stucco. *See* Swidler, Page 225, ln. 6-10.

**MEMORANDUM OF LAW**

**I.        Summary Judgment Standard**

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that no genuine issue of material fact exists and the mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to defeat a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 252 (1986).

**II.    No Coverage Exists Under The Consent Judgment Because It States Horgo Signature Homes And Winfree Homes Are Jointly and Severally Liable**

According to the settlement agreement and consent judgment, Horgo, who MCC never insured, is jointly and severally liable for the entire consent judgment.  However, the Bradfield's cannot  enforce a consent judgment that attempts to create joint and several liability between two entities, one of which MCC did not insure, as to do so is completely contrary to Florida law.  In *Fabre v. Marin*, 623 So. 2d 1182, 1185 (Fla. 1993), the Florida Supreme Court wrote "section 768.81 was enacted to replace joint and several liability with a system that requires each party to

12

pay for noneconomic damages only in proportion to the percentage of fault by which that defendant contributed to the accident." Pursuant to Section 768.81(3), "[i]n a negligence action, the court shall enter judgment against each party liable on the basis of such party's percentage of fault and not on the basis of the doctrine of joint and several liability."   768.81 defines a negligence action as "without limitation, a civil action for damages based upon a theory of negligence, strict liability, products liability, professional malpractice *whether* couched in terms of contract or tort, or breach of warranty and like theories. The substance of an action, not conclusory terms used by a party, determines whether an action is a negligence action."

Examining the Bradfields' underlying action shows the Bradfields sued Horgo and Winfree Homes because Horgo was contractually obligated to not only build the house but to also supervise the construction.  Similarly, the Bradfields contend that because Winfree Homes pulled the permit and acted as the general contractor, it was also responsible for making sure the house complied with the codes and the plans.  Since the Bradfields assert they were damaged when Winfree Homes' and Horgo's alleged actions and omissions concurred with each other, the Bradfields had a duty to allocate their alleged damages between Horgo and Winfree Homes because they could not be jointly and severally liable.  Since the Bradfields failed to do that and Horgo is not insured under any MCC policy, MCC is entitled to a judgment in its favor that no coverage exists for the entire consent judgment.[22]

### III.    All Of The Bradfields' Alleged Damages Are Excluded From Coverage

#### A.    The Damage To Property Exclusion Precludes Coverage

According to the Bradfields main experts, Cecil Clark and Michael Swidler, all of the Bradfields' purported damages occurred as soon as the construction project started.  Mr. Swidler even explicitly stated that it is his expert opinion that the damages occurred on "day one."

---

[22] The Bradfield's obligation to allocate is discussed in Section IV of MCC's Motion.

Assuming that the Bradfields' own experts are correct about when the damages occurred, those damages are precluded from coverage by exclusions j(5) and j(6) which preclude coverage for. "Property Damage" to:

> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Those exclusions "are known as 'business risk' exclusions, which are commonly found in commercial general liability insurance policies.  The purpose of such exclusions is 'to prevent the insured from using its product liability coverage as a form of property insurance to cover the cost of repairing or replacing its own defective products or work.' . . . Where an insured is a builder of homes, as is the case here, 'the entire house is considered the product of the builder.' Thus, the exclusions serve to deny coverage when the insured builder or its subcontractor during construction damage to the home itself."  *E.H. Spencer & Co., LLC v. Essex Ins. Co.*, 944 N.E.2d 1094 (Mass. App. Ct. April 8, 2011). This is precisely the damages sought in the consent judgment here.

In *American Equity Ins. Co. v. Van Ginhoven*, 788 So. 2d 388 (Fla. 5th DCA 2001), a homeowner hired a general contractor, Van Ginhoven, to repair his swimming pool.  Van Ginhoven determined that the pool first needed to be drained.  While draining the pool, the water table pressure caused damage to the pool itself, as well as the pool pump, heater, surrounding deck, screened enclosure, and area landscaping.  The property owner sued Van Ginhoven for negligently draining the pool, and Van Ginhoven filed a claim with his general liability insurer, American Equity.  American Equity conceded coverage for the surrounding property damage but not to the damage sustained by the pool itself since Van Ginhoven was hired to work on the

14

entire pool.   American Equity filed a declaratory judgment action against Van Ginhoven,

asserting exclusions j.(5) and j.(6).

On appeal, the court rejected the trial courts ambiguity argument and cogently detailed

the purpose and scope of j.(5) and j.(6).

> the term "real property" is modified by the terms "on which you … are performing
> operations."   . .Van Ginhoven admitted that when the pool popped, he was draining the
> pool, and thus working on, or performing operations on the pool.   Therefore, this
> exclusion bars coverage for property damage to "that particular part of real property on
> which [Van Ginhoven]·· was [performing operations]**.**"  Similarly, the term "all property"
> is modified by the terms "your work was incorrectly performed on it."   In other words,
> *the exclusion applies to all property on which work was incorrectly performed*.   In his
> corrected final judgment, the trial judge found that "Van Ginhoven drained the swimming
> pool in a negligent manner, causing it to 'pop' or 'float'." Accordingly, the term "all
> property" clearly refers to the pool because Van Ginhoven incorrectly performed work on
> it.

*Id.* at 391.

Van Ginhoven further argued the terms "that particular part of", within the exclusionary

language should only relate to the specific portion of the pool for which Van Ginhoven was hired

to repair.   The court found "[t]his argument is untenable. *Id*.   Instead it reasoned that at the time

the damage occurred, Van Ginhoven was not working, or performing operations on, the spots

subject to repair, but was draining the entire pool." *Id*.   The court completed its reasoning by

addressing the property not within the exclusion.

> Conversely, ***damage to any property that Van Ginhoven was not performing operations
> on, or incorrectly performing work on, is not excluded***. Because Van Ginhoven was not
> working on the plumbing, electrical, deck work, patio, screen enclosure or the residence,
> any damage to those items is covered. …

*Id.* (emphasis added).   In other words, all damages to Van Ginhoven work was within the

exclusion, but damages outside of his work was covered.

Relying on *Van Ginhoven*, the Southern District interpreted j(5) and j(6) in *Amerisure*

*Mut. Ins. Co. v. American Cutting & Drilling Co., Inc.* 2009 WL 700246 (S.D. Fla. 2009). .   In

that case, during the construction of a condominium project, American Cutting & Drilling Co.,

14924850v1 0946262

Inc. ("American Cutting") was hired to cut and chip plumbing access holes in the post tension concrete floors.   The court held that exclusion j(5) applied because American Cutting was chipping concrete (performing operations) on areas of the concrete floor that included embedded cable (that particular part of real property) and damage to the cable (property damage) resulted from American Cutting's concrete chipping (operations).   The Court wrote:

> American Cutting was hired to chip concrete to enlarge concrete holes. This is analogous to Van Ginhoven being hired to perform a discrete repair on the pool. Just like Van Ginhoven had to drain the pool to complete the repair, American Cutting had to work on concrete floor areas that included embedded cable to chip the concrete. American Cutting was working on the area of concrete that included embedded cable when the cable was damaged. This is similar to Van Ginhoven working on the entire pool when the pool was damaged. All of the damages alleged in the counterclaim against American Cutting deal with the damage to the cable. Consequently, damage to the cable is excluded under the policies. The damages for having to break through walls or floors or paying workers overtime are also excluded because the walls and floors were only damaged to gain access to the damaged cable and the workers were only paid overtime because of the delay stemming from the damaged cable. These areas were not independently damaged as a result of American Cutting's activities. Consequently, there are no genuine issues of material fact, and exclusion j(5) of the CGL Policy [] appl[ies] to the insured's claim for coverage. Plaintiffs have no duty to defend and therefore no duty to indemnify American Cutting or any insured in the State Court Action.

*Id.* at 6.  *See also Oak Ford Owners Assoc.* (these two exclusions: "operate in tandem, excluding coverage for property damage arising from ongoing work and for repair or restoration of property because of deficient work."); *Canal Indem. Co. v. Adair Homes, Inc.*, 737 F. Supp. 2d 1294 (W.D. Wash. 2010) (holding the phrase "that particular part" applies to the entire house when the damages are caused by residential general contractor during construction); *E.H. Spencer & Co., LLC v. Essex Ins. Co.*, 944 N.E.2d 1094 (Mass. App. Ct. April 8, 2011) (same).

Unlike in the cases where the contractor was hired to work on a discrete area of the real property, the Bradfields hired Horgo to build their entire house.  Thereafter Horgo entered into an oral agreement for Winfree Homes to serve as the residential general contractor for the entire house.  After the Bradfields moved in they hired another company to install an air handler and to build the pool and pool deck.  Thus, with the exception of the pool, pool deck and air handler,

14924850v1 0946262

that particular part of Horgo's' and Winfree Homes' work was the entire house.  Since the Bradfields' own experts contend the damages occurred on "day one" of the construction of the home, exclusions j(5) and j(6) preclude coverage for all of the damages other than to the air handler pool and pool deck.  However coverage does not exist for these discreet items since the Bradfield's own experts testified that this was defective work which is not property damage under Florida law.  *Auto–Owners Insurance Co. v. Pozzi Window Co.*, 984 So. 2d 1241 (Fla. 2008) ("if there is no damage beyond the faulty workmanship or defective work, then there may be no resulting property damage."); *Amerisure Mut. Ins. Co. v. Auchter Co.*, 673 F.3d 1294, 1305-06 (11th Cir. 2012) (same).

### B.      No Coverage Exists For The Bradfields' Damages Related To Mold

According to the Bradfields and many of their experts, the Bradfields' house contains mold and items such as the drywall and carpeting need to be removed and replaced because of mold.  MCC's mold endorsements unambiguously state the insurance does not apply to:

> **1.** "property damage", … arising out of, or resulting from, caused by, contributed to, attributed to, or in any way related to any fungus, mildew, mold or resulting allergens; **2.** Any costs or expenses associated, in any way, with the abatement, mitigation, remediation, containment, detoxification, neutralization, removal, disposal or any obligation to investigate or assess the presence or effects of any fungus, mildew, mold or resulting allergens; or **3.** Any obligation to share with or repay any person, organization or entity, related in any way to items **1** and 2."

ML 1217 (11 04) and ML 1217 (04/01).  In Florida courts routinely enforce mold exclusions like MCC's.  *See Hathaway Dev. Co., Inc. v. Illinois Union Ins. Co.*, 274 Fed. Appx. 787, 792 (11th Cir. 2008).  Thus, no coverage exists for damages caused by or related to mold or mold remediation.

## IV.    The Coblentz Standard

A consent judgment that can only be enforced if there is coverage for that judgment based upon the actual facts and the amount of the judgment is reasonable and not tainted by bad faith, fraud or collusion. *See Monticello Ins, Co. v. City of Miami Beach*, 2008 WL 906537 *3

(S.D. Fla. 2008).  "Where an injured party wishes to recover under a Coblenz agreement, the injured party must bring an action against the insurer and prove coverage, wrongful refusal to defend, and that the settlement was reasonable and made in good faith." *Chomat v. Northern Ins. Co. of New York*, 919 So. 2d 535, 537 (Fla. 3rd DCA 2006).[23]  "Evidence of both liability and damages are relevant to support the amount of a consent judgment due to the risk that the 'settlement of liability and damages' in a settlement agreement 'may have little relationship to the strength of a plaintiff's claim' where the insured by never be obligated to pay and has little to lose if he stipulates to a large sum with the plaintiff." *Steil v. Fla. Physicians' Ins. Reciprocal,* 448 So. 2d 589, 592 (Fla. 2d DCA 1984).  The Eleventh Circuit has already unequivocally held that "[i]n Florida, it is, as Mid–Continent contends, an all or nothing proposition."  *Mid-Continent Cas. Co. v. American Pride Bldg. Co., LLC*, 534 Fed. Appx. 926, 928 (11th Cir. 2013).

As recently reconfirmed by the Honorable Judge Dalton of the Middle District, the duty to indemnify depends upon actual coverage "measured by the facts as they unfold at trial or are inherent in the settlement agreement."  *Trovillion Const. & Development, Inc. v. Mid-Continent Cas.*, Co., 2014 WL 201678, *7 (M.D. Fla. Jan. 17, 2014) (quoting *IDC Constr.,* 339 F. Supp. 2d at 1349).  *See also State Farm Fire & Cas. Co. v. CTC Dev. Corp.,* 720 So. 2d 1072, 1077 n. 3 (Fla. 1998).  Quoting one of this Court's own decisions, Judge Dalton stated facts "inherent in" a settlement agreement are those "facts extant *at the time the settlement was reached.*" *Trovillion*, 2014 WL 201678 *7 (quoting *Travelers Indem. Co. of Ill. v. Royal Oak Enters., Inc.,* 344 F. Supp. 2d 1358, 1366 (M.D. Fla. 2004)).  It is consequently undeniable that this Court's inquiry is limited to what was known by the Bradfields, Winfree Homes and Horgo at the time Winfree Homes entered into the settlement agreement and not what any of those entities or the

---

[23] The Bradfield's motion for summary judgment on the duty to defend [D.E. 28] is still pending.  Even if the Court finds that MCC breached its duty to defend Winfree, that does not mean that the Bradfields win.  Rather they must still prove coverage *and* that the consent judgment was reasonable and not tainted by bad faith.

Bradfields' experts learned or first observed after they entered into the consent judgment. The Bradfields consequently have the burden of proving every single dollar that comprises the consent judgment was covered since no attempt was made to allocate between covered and uncovered damages and that it was reasonable and based on what was known at the time of they executed the consent judgment. *See American Pride*, 534 Fed. Appx. at 928 ("We also reject American pride's argument that the jury, even if it found the settlement to be unreasonable, should be allowed to fix a reasonable settlement amount.").

> **a.      No Coverage Exists For The Consent Judgment Because It Is Not Allocated Between Covered And Uncovered Damages**

This Court has recognized the "plethora" of Florida cases finding the failure to apportion damages is fatal to an insurer seeking to recover from an alleged co-insurer. *American Cas. Co. of Reading Pa.*, 613 F. Supp. 2d at 1320-21. "Where the judgment includes elements for which an insurer may be liable as well as elements beyond the coverage of the policy, the burden of apportioning the damages is on the party seeking to recover from the insurer." *Guarantee Ins. Co. v. Gulf Ins. Co.*, 628 F. Supp. 867, 870 (S.D. Fla.1986). *See also Aetna Ins. Co. v. Waco Scaffold & Shoring Co.,* 370 So.2d 1149, 1151 (Fla. 4th DCA 1978); *Spencer v. Assurance Co. of Am.,* 39 F.3d 1146, 1149 (11th Cir. 1994).

Directly on point is *Trovillion Const. & Development, Inc. v. Mid-Continent Cas.*, Co. In that case MCC insured Trovillion Construction & Development, Inc. ("Trovillion"), a general contractor. *See Trovillion*, 2014 WL 201678 *1. In 2002 Trovillion contracted with Casa Jardin Development Company ("CJDC") to build a condominium complex. *See id.* Years later CJDC turned over the condominiums to the condominium association and the association's expert inspected the condominiums. *See id.* at *2. The investigation revealed building code violations and system failures, which the expert concluded were causing water intrusion, damage to the interior, building envelope and framing. *See id.* at *2, 5. Based on that report the association

sued Trovillion and CJDC for violating the building code and breaching the contract. *See id.*

Trovillion and the association subsequently entered into a $1.8 million dollar consent judgment. *See id.* The court observed "[t]he express terms of the settlement agreement indicate that the consent judgment subjects Trovillion to liability beyond the scope of the MCC policies; the damages encompassed within it were intended not to be representative of MCC's coverage, but rather to be 'representative of the legal exposure faced by Trovillion' in the underlying lawsuit." *Id.* at *8. "The damages in the consent judgment require both temporal and categorical allocation, but the settlement agreement and consent judgment are completely unallocated." *Id.*

MCC argued that even if some property damage occurred during MCC's policy periods, no coverage existed for the consent judgment because Trovillion failed to allocate the consent judgment between covered and uncovered claims. *See id.* at *8. Judge Dalton agreed, granting MCC's motion for summary judgment holding Florida law "require[d] Trovillion, the party seeking recovery, to allocate the settlement amount between covered and uncovered claims." *See id.* (citing *Keller*, 429 So. 2d at 780; *Am. Cas. Co. of Reading Pa. v. Health Care Indem., Inc.*, 613 F.Supp.2d 1310, 1320 (M.D. Fla. 2009)). "Inability to allocate precludes recovery." *Trovillion* at *8. Citing *Keller*, the Court held that "Trovillion is not relieved of its duty to apportion damages, and its failure to make any effort to do so or to produce evidence suggesting it is capable of doing so is fatal to its indemnification claim." *Id.* at *9.

Here, the Bradfields entered into a $696,108 consent judgment that with the exception of $4,724.45 in costs and $20,333.55 does not explain what the amount represents[24]. However, the Bradfields retained numerous experts who determined the house contains a wide range of

---

[24] The claim for fees are not damages and therefore not covered by any of the MCC policies. *Scottsdale Ins. Co. v. Haynes*, 793 So. 2d 1006, 1009 (Fla. 5th DCA 2001) ("attorney's fees are not damages, but are ancillary to damages, and are not part of a substantive claim."); *GEICO General Ins. Co. v. Williams*, No. 2013 WL 1442157, *7 (Fla. 4th DCA Apr. 10, 2013) ("attorney's fees are not 'damages' or 'costs' within the meaning of the policy"). Since the contract between the Bradfields and Horgo did not contain an attorney fee provision, there was absolutely no basis for including attorney's fees in the consent judgment. This alone makes the consent judgment unreasonable.

14924850v1 0946262

construction defects.   For instance, Page Three of the settlement agreement paraphrases a portion of Mr. Swidler's report and says the ceiling's drywall violates code, and there is a defective roof, improper HVAC air handler and windows.   Examining in depth Mr. Swidler's report shows the Bradfields and their experts contend their roof has missing tiles so the entire roof allegedly needs to be replaced, the drywall purportedly needs to be removed and replaced because it is toxic, the drywall in the garage needs to be removed and placed because it is too thin and violates codes, the pool deck, which was installed after Lake County issued the CO by someone who was not acting on behalf of Winfree Homes or Horgo, has an improper deck elevation and needs to be reelevated, the air handler closet, which was installed after the CO was issued was improperly finished and needs to be redone and the summer kitchen needs to have combustible materials removed.   Each of those items is a construction defect and not property damage.  *Auchter* 673 F.3d at 1305-6 (noting the Florida Supreme Court has drawn a distinction between "a claim for the cost of repairing the subcontractor's defective work," which *is not* covered under a CGL policy, and a claim for repairing the structural damage to another portion of the project that is caused by the defective work).

In addition to the settlement agreement referencing those construction defects, the Bradfields' experts have also testified that they prepared estimates for the Bradfields that are to repair construction defects.  For example, Mr. Swidler, who prepared an estimate for $671,050, an amount that almost equals the consent judgment, testified he included in his estimate a stucco estimate prepare by Allan Lougheed.  According to Mr. Lougheed, the $96,500 estimate includes an amount to reslope the improperly sloped sills at the windows, $6,500 to fix the improper termination the stucco at the band that was a construction defect and $45,000 a midwall weep because that was another construction defect and the midwall weep was required by code.  *See*

Lougheed, Page 124, ln. 7-10, Page 124, ln. 23-Page 125, ln.1 and Page 125, ln. 2-18 and 23-25, Page 126, ln. 12-17, Page 124, ln. 23-Page 125, ln. 25, P. 98, ln. 4-13, P. 99, ln. 22-P. 100, ln. 2.

Also not covered are the mold related amounts included in Clark's estimate.  In particular, Clark said the electric lighting demo, trim, garage door openers, cabinetry, appliance, hardwood floors, carpeting, tile, insulation crown base, drywall and doors all have to be removed because of mold.  *See* Clark, P. 116, ln. 21- P. 117, ln. 1-23. Clark also included in his estimate $231 for personal protection, $4,565 to bag and dispose of everything that has come into contact with mold and $11,37.50 for air scrubbers. *See* P. 126, ln. 7-25, P. 211, ln. 9-P. 212, ln. 3.

The Settlement Agreement and Consent Judgment are silent as to the specific amount that was allocated to covered or uncovered damages.  As Judge Dalton observed this is fatal to the Bradfields' claims against MCC.  Ironically when MCC's counsel asked the Bradfields, Mr. Higo, Mr. Winfree and their counsel during depositions what the dollar value of the consent judgment equaled, the Bradfields' counsel unequivocally objected and then instructed the witnesses not to answer questions regarding allocation.  On the few occasions  the witnesses were allowed to testify they said  they didn't know whether the consent judgment included money for uncovered items such as replacing the roof because it has missing tiles, resloping the balcony, removing and replacing nonconforming but undamaged  drywall that potentially violated the plans and code, removing the allegedly toxic drywall, adding insulation that is required by code, resloping the deck and fixing the defective balcony.  Since the consent judgment fails to allocate between covered and uncovered damages they cannot meet their burden and MCC is entitled to a judgment in its favor that no coverage exists.

## V.    Assuming The Consent Judgement Was Solely for Covered Damages, It Is Unenforceable Since It Unreasonable And Tainted By Bad faith, Fraud or Collusion

The Court must determine whether the consent judgment was reasonable and made in good faith based on what the parties knew at the time they entered into the settlement agreement.

*See. Royal Oak, supra.* The Bradfields have the initial burden of producing evidence sufficient to make a prima facie showing of reasonableness and lack of bad faith. *Monticello Ins. Co. v. City of Miami Beach,* 2008 WL 906537 *3, 4 (S.D. Fla. 2008).   It is only if the Bradfields meet its initial burden, that the burden shifts back to MCC to show that the settlement was not reasonable. Here, the Bradfields can not meet this burden because the judgment was unreasonable and tainted by bad faith.

A settlement or judgment can only be assumed realistic "[i]n a situation where the insured actually pays for the settlement of the claim against him or where the case is fully litigated at trial before the entry of a judgment . . ." *Steil v. Fla. Physicians' Ins. Reciprocal,* 448 So. 2d 589, 592 (Fla. 2d DCA 1984).  This did not happen here.  In *Monticello,* the court said

> Whether a settlement is reasonable, is determined under the 'reasonable person standard.' *Chomat,* 919 So.2d at 538.   "[P]roof of reasonableness is ordinarily established through use of expert witnesses to testify about such matters as the extent of the defendant's liability, the reasonableness of the damages amount in comparison with compensatory awards in other cases, any expense which would have been required for the settling defendants to defend a lawsuit."

*Id.* at *4 (quoting *Chomat v. Northern Ins. Co. of New York*, 919 So. 2d 535, 538 (Fla. 3d DCA 2006)).  "Evidence of both liability and damages are relevant to support the amount of a consent judgment due to the risk that the 'settlement of liability and damages' in a settlement agreement 'may have little relationship to the strength of a plaintiff's claim' where the insured may never be obligated to pay and has little to lose if he stipulates to a large sum with the plaintiff." *Steil v. Fla. Physicians' Ins. Reciprocal,* 448 So. 2d 589, 592 (Fla. 2d DCA 1984).  In order for the settlement to be both reasonable and made in good faith there must be an effort to minimize liability to ensure that the settling parties' engaged in an arm's length negotiation. *Steil*, 448 So. 2d at 592. If like here the party seeking to enforce the consent judgment fails to establish that the consent judgment was reasonable and made in good faith, it cannot be enforced against an insurer and an insurer has no liability to pay any part of the insured's settlement, even if the

23

insurer had absolutely and wrongfully refused to defend its insured. *Taylor v. Safeco Ins. Co.*, 361 So. 2d 743, 746 -747 (Fla. 1st DCA 1978) (If it is established that the consent judgment was fraudulent, collusive or without any effort to minimize liability then Safeco would have no liability to pay *any part* of the insured's settlement. (emphasis added)).

Here, the consent judgment is unreasonable and entered into in bad faith.  Since the Bradfield's own counsel prevented the witnesses from testifying about what occurred at the mediation or the settlement agreement, there is no record evidence that there was an attempt to minimize liability or that there were arms length negotiations.  For this reason alone, the Bradfields cannot meet their burden.  Also, based on the record, the consent judgment is unreasonable.  Mr. Winfree and Mr. Higo testified they do not know what the Bradfields' damages consisted of.  Mr. Winfree even unequivocally stated he has no opinion how much it would cost to fix the house.  Mr. Swidler's scope of work and estimate included damages caused by the pool deck, which neither Winfree Homes nor Horgo Signature Homes built. It also includes over $50,000 to fix the roof, a claim litigated in the Pride Roofing case and then settled for 60% of the estimate or $30,000 when the Bradfields could not prove their claim.  Jordan, P. 58 ln. 13-P. 59, ln. 21.[25]    This fact too prevents the Bradfields from meeting their burden.

Regarding the management fee, Clark said his estimate has a 10% project management fee.  Swidler, without any basis tacked on another 20% fee into his own estimate.  Thus, the Bradfields included a 30% management fee into the consent judgment or over $135,000.  MCC's expert said a management fee for a construction project like the Bradfields would be usual but if one existed it would be no more than 7% under RS Means, the record's only authoritative source.  Swidler also had no real evidence supporting his figure of $68,000 for loss of use other than one mover's bill and then admitted he erroneously doubled the bill's storage fee.  Exh. O, P. 257, ln.

---

[25] Mr. Jordan's deposition pages are attached as Exhibit "U."

14924850v1 0946262

5-20. This is more evidence the consent judgment is unreasonable as Swidler's estimate was taken at face value and not discounted in any meaningful way.

Moreover there was no discount taken for liability even though Mr. Higo believes the balcony was sloped properly because he sprayed a hose for one hour on the balcony and the water ran off the balcony instead of pooling.  *See* Higo, Page 108, ln. 4-13.  Regarding the drywall, Mr. Higo believes the correct size drywall was used because the code only required half an inch.  *See* Higo, P. 111, ln. 18-P. 112, ln. 15.  This is further supported by the plans, which contained specification for both ½ and 5/8 inch drywall.  *See* Exhibit S.  Turning to the summer kitchen, although Swidler's report says the summer kitchen was impermissibly constructed with combustible materials, Mr. Higo testified Lake County would not have issued the CO if that was true.  *See* Higo, P. 112, ln. 16-P. 113, ln. 4. All of these factors demanded a reduction from Swidler's estimate based on valid liability defenses, yet none were taken.  *See also* Exhibit V.

Moreover the consent judgment was tainted by collusion and bad faith.  Horgo Signature Homes is not an additional insured under MCC's policies and the Bradfields never sued Horgo Enterprises but Mr. Higo, who is the president of both companies, assigned rights under MCC's policies to the Bradfields.  When MCC's counsel attempted to ask Mr. Higo why that was done, the Bradfields' counsel objected and Mr. Higo never answered the question.

As the Eleventh Circuit held in *American Pride*, it is an all or nothing proposition.  Here, the amount of the consent judgment is unreasonable since it contains amounts for items not caused by MCC's insureds, amounts the Bradfields already collected to repair the roof (and for far less than the estimate), amounts not supported by any competent evidence, (the management fee and moving expenses) and attorney's fees when there was no legal basis for same.  Therefore the consent judgment cannot be enforced and MCC is not obligated to pay any part of it.

14924850v1 0946262

Respectfully submitted,

_s/_MELISSA A. GILLINOV
Ronald L. Kammer
Florida Bar No. 360589
rkammer@hinshawlaw.com
Melissa A. Gillinov
Florida Bar No. 011892
mgillinov@hinshawlaw.com
HINSHAW & CULBERTSON LLP
2525 Ponce de Leon Blvd., 4th Floor
Coral Gables, Florida 33134
Telephone: 305-358-7747
Facsimile: 305-577-1063
_Counsel for Mid-Continent Casualty Company_

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2014, I electronically filed the foregoing with the Clerk of

the Court by using the CM/ECF system which will send a notice of filing to all counsel of record.

/s/MELISSA A. GILLINOV
Melissa A. Gillinov

26

14924850v1 0946262