UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

JOSEPH BRADFIELD, and PATRICIA
BRADFIELD,

                Plaintiffs,

-vs-                             Case No.  5:13-cv-222-Oc-10PRL

MID-CONTINENT  CASUALTY
COMPANY, a foreign corporation,

                Defendant.

_____/

## <u>ORDER GRANTING SUMMARY JUDGMENT</u>

Joseph and Patricia Bradfield are the owners of a custom residential home they contracted to have constructed for them in Lake County, Florida.  By all accounts, the home is a model of poor workmanship, poor materials and poor construction that began on day one of the project.  There can be no dispute about that.

The Bradfield Home was built by Horgo Signature Homes, Inc. ("Horgo Signature"), and Winfree Homes, Inc. ("Winfree"), two Florida corporations and their various sub-contractors.  Also lurking in the background is another Florida corporation, Horgo Enterprises, Inc. ("Horgo Enterprises").

In August, 2012, the Bradfields sued Horgo Signature and Winfree in state court.[1]  Mid-Continent Casualty Company ("Mid-Continent") had insured Winfree under

---

[1]<u>Bradfield v. Horgo Signature Homes, Inc., and Winfree Homes, Inc.</u>, Case No. 2012 CA 3023, Fifth Judicial Circuit of Florida, in and for Lake County, Florida.  Mid-Continent's unopposed
(continued...)

a Commercial General Liability Insurance Policy.  It had also insured Horgo Enterprises but had never insured Horgo Signature.  When both Horgo Signature and Winfree, the named defendants in the state court action, asked Mid-Continent to undertake their defense in that case, Mid-Continent refused to do so and denied coverage.

In March 2013, the parties in the state court action settled that case by entering into a Colbentz agreement.[2]  A Coblentz agreement, as in the context of this case, relates to a situation in which the insurance carrier for a general contractor declines coverage of a claim brought against the contractor by the home owner.  The contractor and the home owner then agree to resolve their dispute by negotiating a consent judgment to be entered in the underlying case in favor of the home owner and against the contractor.  This is then accompanied by an assignment to the home owner of the contractor's claim against its own insurance carrier for failure to defend the case and indemnify the owner's claim; and, in exchange for that assignment, the home owner releases the contractor from any personal liability under the consent judgment.  The home owner, as an assignee standing in the shoes of the contractor, can then sue the

_____

[1](...continued)
motion requesting the Court to take judicial notice of the complaint in that proceeding (Doc. 25) is Granted.  See Fed. R. Evid. 201.

[2]In addition to the Bradfields as plaintiffs, and Horgo Signature and Winfree as the named defendants in the state court action, the settlement agreement was also executed by, or on behalf of, Horgo Enterprises. The same person, Richard Higo, signed on behalf of both Horgo Signature and Horgo Enterprises.  Though one might speculate, no explanation appears in the agreement or elsewhere in the record as to why Horgo Enterprises took part since it was not a party in the state court litigation.

contractor's insurance company in an attempt to collect on the judgment.  Coblentz v. American Surety Co., 416 F.2d 1059, 1062-63 (5th Cir. 1969).  See also Mid–Continent Cas. Co. v. Am. Pride Bldg. Co., LLC, 601 F.3d 1143, 1147 n. 2 (11th Cir. 2010); Rodriguez v. Sec. Nat'l Ins. Co., 138 So. 3d 520, 521 n. 3 (Fla. 3d Dist. Ct. App.  2014); Perera v. U.S. Fid. & Guar. Co., 35 So. 3d 893, 903 (Fla. 2010).  The Supreme Court of Florida recognized Coblentz agreements in 1984.  Steil v. Florida Physicians' Ins. Reciprocal, 448 So. 2d 489 (Fla. 1984).

This case, then, is the resulting Coblentz litigation brought by the Bradfields, as plaintiffs against Mid-Continent as defendant and as the alleged insurer of Horgo Signature and Winfree.  The object of the suit – the relief requested – is to recover the sum of $696,108.00, the amount of the consent judgment entered in the state court representing the Bradfield's claim of damages for the poor construction of their home.

Presently pending are three motions for summary judgment (Docs. 28, 63, 64), four motions to strike expert testimony (Docs. 68, 83, 88, 130), and four procedural motions (Docs. 25, 81, 106, 146).  Each of the motions has been fully briefed, and is ripe for disposition.

Mid-Continent has successfully demonstrated that there is no genuine issue of material fact with regard to its defensive contentions (1) that the insurance coverage it provided to Horgo Enterprises and Winfree did not extend to Horgo Signature as a claimed additional insured; (2) that the specific items of damage claimed by the Bradfields either were not covered or were excluded by the policies it issued to Winfree

(and, for that matter, those policies it issued to Horgo Enterprises); and/or (3) that the consent judgment entered in state court pursuant to the <u>Coblentz</u> agreement was not reasonable and/or was the result of collusion.  Summary judgment will therefore be granted to Mid-Continent and denied to the Bradfields.  The remaining motions will be denied as moot.[3]

### **Undisputed Material Facts**

### **I.      Construction of the Bradfield Home**

On August 3, 2005, the Bradfields entered into a Contract for Sale and Purchase with Horgo Signature (the "Home Contract") for construction of a single-family residence located in Lake County, Florida at a price of $760,560, consisting of $150,000 for the land, and $610,560 for construction of the house (the "Bradfield Home").  (Doc. 25-1, Ex. A).  The Bradfields contracted solely with Horgo Signature, and worked directly with Richard Higo (President and Project Manager of Horgo Signature) and Philip Horvath (employee of Horgo Signature).  The Bradfields did not enter into any contracts with Winfree.  The Bradfields both testified at their depositions that they never had any dealings with Winfree, and did not even know Winfree existed until litigation commenced.  (Doc. 64-8, pp. 42-43, Doc. 122-13).

On September 22, 2005, Horgo Signature, through Mr. Higo, applied for and obtained a building permit from the Lake County Building Department for construction

---

[3]The Court has reviewed the motions to strike expert testimony and finds that disposition of those motions is not necessary to the resolution of the motions for summary judgment.

of the Bradfield Home.  (Doc. 25-1, Ex. D).  Winfree was listed on the permit application

as the contractor.[4]  The permit was issued on November 1, 2005, and expressly stated

that it would become null and void if a satisfactory inspection was not completed within

six months.  (Id.).  Such an inspection did not occur during that time period.  For

reasons undisclosed on the record, Mr. Higo did not apply for a second building permit

until December 3, 2006 (Id.).  While this permit application is signed by Mr. Higo as

"contractor," the application clearly lists Winfree as the contractor.

Winfree was the residential general contractor for the Bradfield Home and, as

between Winfree and Horgo Signature, Winfree was responsible for building most of

the segments of construction of the home.  According to Mr. Higo, Winfree performed

all of the concrete work "from zero to framing," including the foundation, floor, block

work, lintel, and strapping to the second floor.  (Doc. 63-1, pp. 57, 63-64).  However,

it appears from the record that most, if not all, of Winfree's work was actually performed

by various specialty subcontractors.  (Doc. 75, pp. 34, 53, 77-78, 80-81, 99, 105, 122-

23).  There is also evidence that Mr. Higo, through either Horgo Enterprises or Horgo

Signature, hired, supervised, and paid for all subcontractors.  (Id., pp. 34, 53).  Winfree

and Horgo Signature established this loose relationship also by oral agreements.  The

---

[4]At some point in time, Winfree and Horgo Signature had agreed to go into business with each other to build custom homes and to split the profits.  The companies made this agreement orally.  It is undisputed that there are no written agreements of any kind in existence between Winfree and Horgo Signature or between Winfree and Horgo Enterprises.  Winfree, Horgo Signature, and Horgo Enterprises are all now dissolved and no longer operate in the State of Florida.

two companies did not execute any mutual written contracts concerning the Bradfield Home. (Doc. 63-3, pp. 46-47).

According to Horgo Signature, Winfree, and the Bradfields, the home was substantially completed on or before May 20, 2006.  This included the monolithic slab; block walls and lintels; all roofing; framing of the interior and exterior walls, porches and stairs; installation of windows and doors; installation of drywall; electrical rough-in; plumbing rough-in; and HVAC systems rough-ins.  However, the Lake County Building Records show that the "rough" insulation inspection was not conducted until June 29, 2006, the framing failed three inspections in June 2006, the house was not authorized for "prepower" until December 5, 2006, and did not pass the electric "final inspection" on December 11, 2006 because the "trim out [was] not complete."  (Doc. 53, Exs. I, K).[5] In addition, the building permit for the Bradfield Home was renewed on December 5, 2006 "at 10% for finals only."  Moreover, Mr. Winfree candidly testified at deposition that: (1) he was not sure when all of the work was completed although he thinks most of the framing would have been completed by April 27, 2006; (2) the grading work was performed between August and November 2006; and (3) no one ever told him that the framing of the interior and exterior walls, porches, and stairs were completed prior to May 20, 2006 (Doc. 75, pp. 62-67, 70, 81, 125-126, 164).

---

[5]While these documents are not attached to the parties' summary judgment papers, they were filed as exhibits attached to other pleadings and "[a] district court may look at all the evidence in the record to determine whether issues of material fact exist regarding the plaintiff's asserted causes of action."  Fils v. City of Aventura, 647 F.3d 1272, 1285 (11th Cir. 2011).

In any event, the house passed inspection by December 13, 2006, when the

Lake County, Florida Building Department issued its Certificate of Occupancy (Doc. 63-

5).  The Certificate of Occupancy lists the owner as Richard M. Higo and the contractor

as Winfree.  (Id.).  After the Certificate was issued, the Bradfields paid the remaining

amount due on the Home Contract, and moved into the home just before Christmas of

2006.

## II.    Defects in the Construction of the Bradfield Home

Within 30 days of moving in, contractors were engaged to recaulk the windows,

and a portion of the garage ceiling collapsed and was replaced for the first of three

times.  Dr. Bradfield also first noticed water intrusion from the balcony when the garage

ceiling was torn out in 2007.

Approximately six months after moving in, on or about June 2007, the Bradfields

discovered additional water damage in the garage and dining room.   This leak was

caused by the doors out to the balcony off the bedroom above the garage.   Horgo

Signature performed the repairs which encompassed removing the drywall in both the

garage and dining room, replacing the hardwood flooring, installing a larger flashing in

the wood frame, and removal of mold.  (Doc. 64-1, pp. 85-86).

Within a year of moving in, Dr. Bradfield also noticed the summer kitchen was

constructed with the wrong wood and was improperly sealed.  He also observed that

the front porch sloped toward the house which allowed water to seep into the home.[6] However, the Bradfields did not take any steps to repair the front door and front porch for several years.  Lastly, Dr. Bradfield believes there are problems with five windows in the dining room and exercise room, but does not know if they were improperly installed.

In January 2007 the roof suffered damage and was repaired.  The Bradfields eventually sued the roofing subcontractor, Pride USA, in separate state court litigation, and that case was resolved by a settlement agreement executed on November 26, 2013 (Doc. 64, Ex. J).  As part of the settlement, Pride USA paid $30,000 to the Bradfields, who in turn released and indemnified Pride USA from any and all claims arising from Pride USA's work on the Bradfield Home (Id.).  Dr. Bradfield testified that other than January 2007, there has been no other water damage to the Bradfield Home caused by any roofing issues.  (Doc. 64-9, pp. 15-16; Doc. 64-6, p. 86).

In 2009, the Bradfields had a pool, pool deck, and pool bath constructed by Blue Haven Pools and Spas, a company not affiliated with Horgo Signature or Winfree.  The pool deck was not constructed properly and has sagging pavers.  The record does not disclose whether the Bradfields ever sued Blue Haven Pools and Spas for the improper construction of the pool area.

---

[6]Mr. Horvath testified that the Bradfields purchased their front door themselves from an outside vendor, and that water penetrated through the wood in the front door and entered the house.  Horgo Signature (through one of its subcontractors) installed the front door.  (Doc. 64-2, p. 53).

In 2011, the Bradfields discovered another leak in the garage and master bedroom closet, as well as in a portion of the exercise room.  It is not clear from the record whether anyone made the necessary repairs, however, Dr. Bradfield testified that every time there was a leak, Mr. Higo came out to fix it.  (Doc. 64-6, p. 42).

In 2012, the Bradfields retained Michael Swidler from the Endeavor Group, Inc., to conduct an inspection of the home.  On or about April 12, 2012, the Bradfields received an Inspection Report from the Endeavor Group, Inc., (Doc. 30, Ex. B).  The report disclosed the following issues:

(1)   Signs of tile slippage and leaks on the roof and the absence of metal hurricane clips;

(2)   A "belief" that the Bradfield Home has toxic drywall, however at the time of the report, tests on the drywall had not been completed;

(3)   An assumption that mold exists in the house due to prior water intrusion in the garage, front foyer, and pool bath, and a statement that mold can spread through the HVAC system into the entire home;

(4)   Water intrusion through the windows, and a "belief" that the windows were not installed properly;

(5)   Sagging in the drywall in the garage due to water leaks and use of drywall of an inadequate thickness;

(6)   The balcony was not sloped properly, allowing water into the garage ceiling;

(7)   Water intrusion caused by the pool deck elevation holding water and leaking into the pool bath due to the deck's pavers being too high;

(8)     The a/c handler in the garage closet was "not finished like the rest of the home;"

(9)     The drywall used in the ceilings is not the proper thickness; and

(10)    The summer kitchen was built with materials that pose a fire hazard and should be replaced.

At his deposition, Mr. Swidler testified that he also observed buckling wood by the dining room, the game room, and the office.  He believes that all of the damages to the Bradfield Home began on "day one."  (Doc. 64-15, pp. 25-26).

The Bradfields also retained Mr. Swidler to prepare an estimate for repairing all of the defects in the Bradfield Home.  Mr. Swidler in turn retained Derelle Inc., a general contracting company managed by Cecil Clark, to prepare an estimate to remove and replace the entire interior of the Bradfield Home down to the studs.  Mr. Clark inspected the Bradfield Home and opined that all of the damages started when the windows were installed (Doc. 64-16, p. 46).  Mr. Clark's estimate included removing all of the drywall, windows, granite tops, vanities, all of the hardwood flooring, all of the carpeting, all of the plumbing, the attic insulation, and all of the tile work.  The estimate also included the removal and repair of areas that had no signs or evidence of damage, such as the roof, which was not leaking, but was simply missing hurricane clips.  Mr. Clark's estimate also included removal and replacement of portions of the interior due to mold, including electric lighting demo, trim, garage door openers, cabinetry, appliances, insulation crown base, drywall, and doors.  The estimate also added in

amounts for personal protection and the cost to bag and dispose of everything that came into contact with the mold.  Lastly, Mr. Clark added a $27,000 supervision fee.

Mr. Clark delivered his initial estimate to Mr. Swidler on December 6, 2012.  The amount of the initial estimate was $444,464.50 (Doc. 64, Ex. Q).  After consultations with Mr. Swidler, Mr. Clark submitted a second estimate that same day in the amount of $486,464.50, which included $42,000 for unforeseen damages (Doc. 64, Ex. R).

Mr. Swidler obtained another estimate from Allan Lougheed, a purported construction expert, who submitted an estimate for repairing and replacing almost all of the same items listed in Mr. Clark's estimate.  Mr. Lougheed reported that all repairs would cost $279,564.00 (Doc. 77, pp. 3-4).

Using Mr. Clark's and Mr. Lougheed's respective estimates, Mr. Swidler prepared his own estimate for all of the repairs to the Bradfield Home.  On December 13, 2012, he submitted to the Bradfields an estimate in the amount of $671,050, which included painting, repairs to defective stucco, repairs to the balcony, replacement of the entire roof, refinishing the air handler, removal and replacement of the drywall throughout the house, landscaping costs, and moving expenses (Doc. 64-14).  The Swidler estimate of December 13, 2012 appears to have been a combination of the entire $486,464.50 from Mr. Clark's estimate, plus portions of Mr. Lougheed's estimate in the amounts of $96,500.00 for stucco, $30,500.00 for balcony repairs, $12,700.00 for unforeseen costs, and a 10% profit charge of $12,700.00.  Mr. Swidler's estimate

also included an additional $32,185.50 for "mold protocol/remediation" over and above the mold charges included in Mr. Clark's estimate.   (Doc. 73, pp. 48-49).

On December 14, 2012, Mr. Swidler submitted a second estimate in the amount of $787,494.00 (Doc. 68, Ex. C).  It appears that Mr. Swidler removed the $42,000.00 in unforeseen damages fee, as well as $24,000.00 of the mold remediation charges and $800.00 in appliance fees.  He then added an additional $4000.00 for pavers, a 15% project management fee in the amount of $91,237.00, $20,000.00 in landscaping charges, and $68,000.00 for the Bradfields' moving and living expenses (Doc. 73, pp. 48-49).

The Bradfields continued to live in their home until February 2014, when they moved out because it was no longer habitable.

### III.    The Underlying State Lawsuit

On August 29, 2012, after giving notice as required by Florida law,[7] the Bradfields filed suit in the Fifth Judicial Circuit in and for Lake County, Florida; Bradfield v. Horgo Signature Homes, Inc. and Winfree Homes, Inc., Case No. 2012 CA 3023 (the "Underlying Case").

---

[7]Fla. Stat. § 558.004, otherwise known as the Florida Construction Defect Statute, requires, among other things, that owners send a notice of claim to developers, contractors, subcontractors, suppliers, and/or design professionals identifying in reasonable detail any alleged construction and/or design defects before any litigation or arbitration for construction defects may be initiated. The owners must also provide an opportunity to cure the defects in the form of a 60-day period, and permit a reasonable inspection of the property to assess each alleged defect.

The Bradfields alleged that on August 3, 2005, they entered into a Contract for Sale and Purchase with Horgo Signature, and that in April 2012, they learned that their home suffered from latent construction defects that materially affected the structural integrity of the home and caused the Bradfields damages.  (Doc. 25-1, ¶¶ 6, 12, 18, 25, 33).  The alleged latent defects included, but were not limited to: (a) water intrusion on the tile roof, windows, and pool bath; (b) mold; (c) code violations in the garage drywall; (d) improper sloping on the front balcony; (e) improper installation of air handler and windows; (f) improper ceiling installation; (g) improper installation of combustible materials in summer kitchen; and (h) improper installation of roofing materials.  (Id., ¶ 13).  The Bradfields also incorporated and attached the Endeavor Group report to their complaint.  (Id., ¶ 14).  However, the complaint did not contain the phrases "property damage" or "structural damage."

The Bradfields asserted two claims against Horgo Signature in the Underlying Case.  The first was a breach of contract claim alleging that Horgo Signature materially breached its obligations to the Bradfields under the Home Contract by failing to supervise construction and build the home in a workmanlike manner in accordance with industry standards and governing codes (Doc. 25-1, ¶¶ 9-18).  Second, the Bradfields' alleged that by failing to inform them of the nature of the structural defects in the home, Horgo Signature breached a fiduciary duty to construct and supervise the construction of the Bradfield home in a reasonably prudent manner.  (Id., ¶¶ 27-33).

The Bradfields' lone claim against Winfree in the Underlying Case was couched in terms of a negligence cause of action: (1) that Winfree had a duty to construct the Bradfield home in accordance with minimum industry standards and governing applicable codes; (2) that Winfree breached that duty; and (3) that Winfree's breach directly and proximately caused damages to the Bradfields. (Doc. 25-1, ¶¶ 19-26).

The Bradfields did not allege any cause of action against Horgo Signature or Winfree under a theory of vicarious liability, rather, each claim was based on each company's own acts and omissions. Also, the Bradfields did not bring suit or assert any claims against Horgo Enterprises.

Mid-Continent was given notice of the Bradfields' state court lawsuit, but through a series of letters dated September 20, 2012, September 24, 2012, November 1, 2012, and January 3, 2013, refused to defend the case and denied coverage of the claims of damages. <u>See</u> Doc. 2, Ex. D; Doc. 30, pp. 50-75; Doc. 32-5.

## IV.   Settlement of the Underlying Case

In response to the Bradfields' complaint, Winfree and Horgo Signature filed a motion to dismiss. However, Winfree and Horgo Signature withdrew their motion on November 28, 2012, after counsel for all sides had entered into settlement negotiations and began drafting a settlement agreement. <u>See</u> Doc. 2, Ex. H, p. 6; <u>see also</u> Doc. 57-7, pp. 42, 63, 65-66. On December 15, 2012 Winfree and Horgo Signature filed a joint answer and six affirmative defenses (Doc. 57-8, p. 81). Aside from this responsive

-14-

pleading, there is no evidence in the record that Winfree or Horgo Signature thereafter engaged in any discovery, motion practice, or other prosecution of the Underlying Case.

The parties scheduled mediation for February 21, 2013.  On February 7 & 8, 2013, the Bradfields wrote to Mid-Continent and provided a written copy of the notice of mediation. (Doc. 2, Ex. E).  On February 8, 2013, Winfree and Horgo Signature also wrote to Mid-Continent to notify it of the date, time and location of the mediation.  (Id., Ex. F).  Mid-Continent responded that it "will not be participating in the settlement process of the subject case," and did not thereafter attend the mediation conference (Doc. 30, p. 83).

The mediation conference was held as scheduled on February 21, 2013, and all parties to the suit were represented by legal counsel.  Mr. Winfree testified at his deposition that neither he nor Mr. Higo brought any documents to the mediation. (Doc. 122-11, p. 14).  All of the parties and their counsel met in a conference room for about an hour at the start of the mediation, during which the parties made opening statements. (Id., pp. 14-18).  Mr. Winfree recalled that the parties all agreed that they would try and get Mid-Continent to pay for any settlement.  (Id., p. 15).  At the conclusion of these initial presentations, both Mr. Winfree and Mr. Higo left the conference room and sat outside in a reception room for the next five to six hours (Id., pp. 18, 20-21, 77).  Neither Mr. Winfree nor Mr. Higo took part in any further negotiations during the mediation conference, and they were never asked back into the

conference room.  (Id., p. 43).  Eventually their attorney told them that they could go home while the attorneys for both sides continued to work on a settlement draft (Id., p. 43, 78).  In addition to not participating in the settlement negotiations, Mr. Winfree testified that he never made any sort of counteroffer to the Bradfields, never challenged the dollar amounts demanded by the Bradfields, and did not recall seeing any damages calculations or a draft agreement during the mediation conference.  (Doc. 122-11, pp. 43-44, 53-54).

On March 6, 2013, the Bradfields, Winfree, and Horgo Signature executed a Mediated Settlement Agreement ("MSA") (Doc. 2, Ex. H).  The MSA is signed by the Bradfields, Norman Winfree on behalf of Winfree, and Richard Higo on behalf of both Horgo Signature and Horgo Enterprises.[8]

According to the terms of the MSA, Horgo Signature and Winfree agreed to be held jointly and severally liable in the amount of $696,108, consisting of $671,050 in damages, $20,333.55 in attorney's fees, and $4,724.45 in costs.  (Doc. 2, Ex. H, p. 4).  The damages were not broken down into categories (such as damages for roofing, flooring, drywall, mold removal, etc).  Rather the damages were listed as one lump sum.[9]

---

[8]It is unclear from the record why Mr. Higo signed the MSA on behalf of Horgo Enterprises, which was never a party in the Underlying Case.

[9]The MSA states that "[t]he Bradfields' reasonable and necessary costs to repair the damages caused by the defective work and Latent Defects to the Bradfield Home are $671,050, exclusive of costs and attorney's fees, as indicated on Exhibit B attached hereto and incorporated (continued...)

The MSA stated that Winfree was retained as the general contractor for the Bradfield Home, and did the majority of the construction.  The MSA further stated that Winfree allowed Horgo Signature to assist in the construction, under Winfree's direct supervision.  (Doc. 2, Ex. H, p. 2).  The agreement reiterated the allegations of the complaint, and incorporated both the contract for the Bradfield Home and the Endeavor Report.  However, the MSA deviated from the complaint by stating that the latent defects in the  home, which were first discovered on April 9, 2012, "caused structural damage to the Bradfield Home," and that all work related to the latent defects was completed on or before May 20, 2006.  (Id., p. 3).

The MSA further stated that both Winfree and Horgo Signature were insured by Mid-Continent, and that Mid-Continent had refused to defend or indemnify either company.  (Doc. 2, Ex. H, pp. 4-6).  As part of the MSA, Horgo Signature and Winfree, following the Coblentz model, assigned their rights under their respective insurance policies to the Bradfields.  (Id., p. 11).  In addition, and conditioned upon satisfaction of a Consent Judgment, the Bradfields agreed to release Horgo Signature, Horgo Enterprises, and Winfree from any and all claims, known or unknown, that may have accrued up to the date of the MSA (Id., pp. 13-14).  Lastly, the MSA stated that the

_____

[9](...continued)
herein incorporated by reference [sic] which was prepared by the Endeavor Group, Inc." (Doc. 2, Ex. H, p. 4).  However, there is no "Exhibit B" attached to the MSA, and the Bradfields have not submitted any "Exhibit B."  The Bradfields' counsel suggested at his deposition that "Exhibit B" is Mr. Swidler's December 13, 2012 estimate.

parties each voluntarily entered into the agreement in good faith to resolve all claims, that all terms were fair and reasonable, and that no party was subject to any coercion, distress, or undue influence. (Id., pp. 6, 8-9).  The MSA also affirmed that no party had reached an accord to guarantee any certain amount of recovery, and that neither Winfree's nor Horgo Signature's liability was increased or decreased by entering into the MSA (Id., p. 12).

At deposition, Mr. Higo testified that he had no firsthand knowledge about the damages to the Bradfield home; he did not know if there were problems with the hardwood floors, paint, carpeting, roof, paving, tile, or block to frame wall.  (Doc. 64-1, pp. 138-39, 143-145, 150, 153-54).  Mr. Higo also had no idea how the parties calculated the $671,050 in damages listed in the MSA, and did not see that amount until some point after the mediation conference (Doc. 122-7, pp. 30-31).  Mr. Higo further testified that he was not part of any discussions concerning the composition of the MSA, and did not make any changes to the agreement or ask any questions about its contents.  (Id., p. 35).  In addition, Mr. Higo was not aware of the categories of damages that were included in the amount listed on the MSA, did not know if the MSA included damages for items that Horgo Signature and/or Winfree were not responsible for (such as the pool bath and roof), and did not know if the MSA amount included the costs of repairing or replacing defective products versus the costs of repairing other damage. (Id., pp. 55, 73-77, 112-13).

Dr. and Mrs. Bradfield's deposition testimony about the contents of the MSA was strikingly similar to Mr. Higo's.  They also testified that they had no knowledge as to how the parties reached the $671,050 damages amount, and could not speak to what categories of damages were included in the MSA; they simply accepted the damages amount at face value.  (Doc. 122-8, pp. 168, 174, 178-79, 189, Doc. 122-10, pp. 171-72, 177).  However, Dr. Bradfield did testify that he believed the final damages amount was the product of some negotiation "by the people who were in the room knocking out the nitty-gritty."  (Doc. 122-8, p. 174).[10]

Mr. Winfree also gave deposition testimony about the amount of damages listed in the MSA.  He similarly testified that he lacked knowledge about the actual damages to the Bradfield Home, and had not been back out to the home since the Certificate of Occupancy had been issued (Doc. 64-3, pp. 38, 105-07, 124-25, 130).  Mr. Winfree also had no knowledge as to how the $671,050 damages amount was calculated, or what types of property damages or other expenses were included in the lump sum (Doc. 122-11, pp. 53-54, 58, 60-64. 76).  Mr. Winfree did testify, however, that for the amount listed in the MSA, "you could tear the whole house down, throw it in the garbage and rebuild it."  (Id., p. 62).  Mr. Winfree candidly admitted that he agreed to the MSA because he could not afford to defend himself in the Underlying Case, and "if

_____

[10]Mrs. Bradfield testified that she believed the damages amount listed in the MSA was a 15% reduction from another, higher estimate.  (Doc. 122-10, pp. 210-12).  However, she was unable to specify how this 15% was determined, and could not recall who told her about a 15% reduction (Id.).

they can make [Mid-Continent] pay for it, so be it." (Id., p. 51).  More specifically, Mr. Winfree testified that "I threw [Mid-Continent] under the bus for me, yes.  Just like they throwed [sic] me under the bus." (Id., p. 98).

The state court ratified and confirmed the MSA, and  entered a Consent Final Judgment on March 11, 2013 in the full amount of $696,108.00 (Doc. 2, Ex. I).  The Consent Judgment stated that the Bradfields were deemed to be third-party beneficiaries of the Mid-Continent insurance policies, and the real party in interest for any bad faith settlement practices claims.[11]  Id.

On March 28, 2013, the Bradfields provided Mid-Continent with a copy of the Consent Judgment and demanded that Mid-Continent satisfy the judgment, plus all accrued interest.  (Id., Ex. J).  Mid-Continent refused, and the Bradfields initiated the present litigation.

## Summary Judgment Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In applying this standard, the Court must examine the materials on file and the record evidence "in the light most favorable to the nonmoving party."  Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  When faced with a "properly supported motion

---

[11]The Bradfields have not asserted any bad faith claims in the present case.

for summary judgment [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997). The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

At the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986). Some degree of factual dispute is expected, but to successfully counter a motion for summary judgment the factual dispute must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248, 106 S. Ct. at 2510.

However, in this case, neither side has requested a trial by jury. Thus, both the breach of contract claim and the declaratory judgment claim will be resolved by the Court as the ultimate trier of fact. In such circumstances, it is the law of the Circuit that:

> If decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved. Under those circumstances, which may be rare, the judge who is also the trier of fact may be warranted in concluding that there was or was not negligence, or that someone acted reasonably or unreasonably, . . . even if that conclusion is deemed "factual" or involves a "mixed question of fact and

law." A trial on the merits would reveal no additional data. Hearing and viewing the witnesses subject to cross-examination would not aid the determination if there are neither issues of credibility nor controversies with respect to the substance of the proposed testimony. The judge, as trier of fact, is in a position to and ought to draw his inferences without resort to the expense of trial.

Nunez v. Superior Oil Co., 572 F.2d 1119, 1123-24 (5th Cir. 1978).[12] See also Feaz

v. Wells Fargo Bank, N.A., 745 F.3d 1098, 1104 (11th Cir. 2014) (The interpretation of

an insurance contract is a question of law to be decided by the Court.).

## Discussion

### I.    The Bradfields' Claims In This Litigation

The Bradfields have alleged two claims against Mid-Continent (Doc. 1).  Count I is a claim for damages under a breach of contract theory.  The Bradfields allege that Mid-Continent breached its duties to defend and indemnify Winfree and Horgo Signature in the Underlying Case.  Count II is a claim for declaratory relief.  The Bradfields seek a declaration that Mid-Continent had a duty to defend both Winfree and Horgo Signature, and is obligated to satisfy the Consent Judgment.  Mid-Continent seeks summary judgment on both claims (Docs. 63-64), and the Bradfields seek summary judgment on Count II with respect to Mid-Continent's purported duty to defend Winfree in the Underlying Case (Doc. 28).

-------

[12]Fifth Circuit decisions rendered prior to September 30, 1981 are binding precedent on this Court.  Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1982).

## II.  Mid-Continent's Coverage of Horgo Signature

Mid-Continent has filed an amended motion for summary judgment with respect to the Bradfields' claims relating to Horgo Signature (Doc. 63).  Mid-Continent contends that it has no duty to defend or indemnify Horgo Signature, and is not obligated to pay the Consent Judgment, because it never insured Horgo Signature under any policy.

It is undisputed that Mid-Continent never issued an insurance policy to Horgo Signature, and that no written policy exists listing Horgo Signature as an insured or an additional insured (Doc. 76, p. 3).  The Bradfields nonetheless argue that material issues of fact remain in dispute as to whether Horgo Signature was an additional insured under either the Horgo Enterprises or Winfree policies "based on [Mid-Continent] being notified that Horgo Signature was performing the work, that certificates of insurance were issued naming Horgo Signature as an insured under the Horgo Enterprises policies, and that [Mid-Continent] was notified and conducted annual audits to ensure that Horgo Signature was properly covered."  (Id.).  That representation is not supported by the record and is simply wrong.  There is no evidence of any certificates of insurance issued by Mid-Continent naming Horgo Signature as an insured or additional insured, and notices sent to, or audits performed by Mid-Continent, the existence of which is also without support in the record, would be inconsequential as a matter of law.[13]

---

[13]While not entirely clear, it is possible that the Bradfields are also arguing that Horgo (continued...)

The Additional Insured Endorsement contained in the Winfree and Horgo Enterprises policies defines an additional insured as "Any person or organization for whom the named insured has agreed by written 'insured contract' to designate as an additional insured subject to all provisions and limitations of this policy."  (Doc. 32-1, p. 39; Doc. 32-2, p. 38; Doc. 32-3, p. 42; Doc. 63-21, p. 37; Doc. 63-22, p. 39; Doc. 63-23, p. 42; Doc. 63-24, p. 42).  The policies cover such additional insured "only with respect to liability directly attributable to [the named insured's] performance of ongoing operations for that [additional] insured."  (Id.).  The policies further defines an "insured contract" as, among other things, "that part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for 'bodily injury' or 'property damage' to a third person or organization, provided the 'bodily injury' or 'property damage' is caused, in whole or in part, by you or by those acting on your behalf. "  (Doc. 32-1, p. 38; Doc. 32-2, p. 27; Doc. 32-3, p. 27; Doc. 63-21, p. 29; Doc. 63-22, p. 32; Doc. 63-23, p. 35; Doc. 63-24, p. 32).

Thus, under the plain and unambiguous language of the Policies, in order for Horgo Signature to be an additional insured, there must be:  (1) a written "insured

------

[13](...continued)
Signature was part of a joint venture with either Winfree or Horgo Enterprises, and therefore falls under the insurance policy's definition of "who is an insured" which includes joint ventures.  See, e.g., Doc. 32-1, p. 19.  However, that same policy provision requires that all joint ventures be designated in the policy's declarations, and it is undisputed that no one ever designated the working relationship between Winfree and Horgo Signature, or Horgo Enterprises and Horgo Signature, as a joint venture.

contract" between Horgo Signature and Horgo Enterprises or between Horgo Signature and Winfree; <u>and</u> (2) the liability at issue must be directly attributable to the primary insured's (Horgo Enterprises or Winfree) performance of its work for the putative additional insured (Horgo Signature).  <u>See</u> <u>Mid-Continent Cas. Co. v. Construction Servs. & Consultants, Inc.</u>, 2008 WL 896221 (S.D. Fla. Mar. 31, 2008); <u>United Rentals, Inc. v. Mid-Continent Cas. Co.</u>, 843 F. Supp. 2d 1309 (S.D. Fla. 2012); <u>Amerisure Ins. Co. v. Orange & Blue Const., Inc.</u>, 913 F. Supp. 2d 1363, 1369-70 (S.D. Fla. 2012); <u>King Cole Condo. Ass'n., Inc. v. Mid-Continent Cas. Co.</u>, 21 F. Supp. 3d 1296 (S.D. Fla. 2014) (all interpreting identical additional insured endorsements and holding that, to be an additional insured, there must be a written insured contract and vicarious liability).  Here neither requirement is satisfied.

First, it is undisputed that no written agreements of any kind exist between Horgo Signature and either Winfree or Horgo Enterprises.  And second, the allegations of the Bradfields' complaint in the Underlying Case assert claims against Horgo Signature for its own breach of its contract with the Bradfields, and for its own alleged breach of fiduciary duties purportedly owed to the Bradfields.  The Bradfields did not pursue a theory of vicarious liability against Horgo Signature.  <u>See</u> Doc. 25-1, ¶¶ 17-18, 28-33. <u>See</u> <u>also</u> <u>Goldschmidt v. Holman</u>, 571 So. 2d 422, 423 (Fla. 1990) (Florida law requires a plaintiff to specifically plead vicarious liability as a separate cause of action); <u>Amerisure Ins. Co. v. Orange and Blue Const., Inc.</u>, 545 Fed. Appx. 851, 855 (11th Cir. Nov. 4, 2013) ("insured contract" exception to Employer's Liability Exclusion in a

general liability insurance policy does not apply where the purported additional insured was sued for tort claims based on its own alleged acts and omissions and not under a vicarious liability theory).

Based on the undisputed facts and the plain language of the Winfree and Horgo Enterprises policies, the Court concludes as a matter of law that Horgo Signature is not an additional insured under any policy issued to either Horgo Enterprises or Winfree and, therefore, Mid-Continent was under no obligation to defend or indemnify Horgo Signature.  Because the language of the Policies is clear and unambiguous, the Court cannot consider any of the extrinsic "facts" listed by the Bradfields such as the purported notifications, audits and certificates of insurance.  Atlantic Marine Florida, LLC v. Evanston Ins. Co., 775 F.3d 1268, 1276, n. 25 (11th Cir. 2014) (" 'Where the language in an insurance contract is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning so as to give effect to the policy as written'; extrinsic evidence of the parties' intent is not relevant to the analysis.") (quoting Wash. Nat'l Ins. Co. v. Ruderman, 117 So. 3d 943, 948, 952 (Fla. 2013)); Fireman's Fund Ins. Co. v. Tropical Shipping & Constr. Co., 254 F.3d 987, 1003 (11th Cir. 2001) ("Under Florida law, 'the parties' intent is to be measured solely by the language of the policies unless the language is ambiguous.'  Thus, in the absence of ambiguous language, a court may not look to parol evidence in ascertaining the intent of the parties to an insurance contract.") (quoting Towne Realty v. Safeco Ins. Co. of Am., 854 F.2d 1264, 1267 (11th Cir. 1988)).

Even if the Court were to go beyond the four corners of the Winfree and Horgo Enterprises policies and examine the additional arguments made by the Bradfields, none are sufficient to defeat summary judgment.  All but one of the arguments rely on the Bradfields' misinterpretation and mis-quotation of the deposition testimony of Mr. Higo.  For example, the Bradfields contend that Mr. Higo testified that:  (1) he "believed" that Horgo Signature was insured simply because it built homes; (2) Horgo Enterprises and Horgo Signature were essentially the same corporate entity; (3) Horgo Signature did not have its own bank account; (4) Mid-Continent was notified that Horgo Signature was performing work on the Bradfield Home; (5) Mid-Continent issued certificates of insurance naming Horgo Signature as an insured; and (6) Mid-Continent was notified and conducted annual audits to ensure Horgo Signature was covered.  (Doc. 76, p. 2; Doc. 93, pp. 3-4).  Each of these purported references to Mr. Higo's deposition testimony are either inadmissible under the "best evidence" rule, contradicted by other portions of Mr. Higo's deposition, and/or belied by other undisputed record evidence.[14]  And, in any event, even if such testimony was accurate

---

[14]Mr. Higo unequivocally testified that he never saw any insurance policies for Horgo Signature.  In addition, Mr. Higo and Mr. Hovath both testified that Horgo Signature and Horgo Enterprises were separate corporate entities, created and maintained for separate and legitimate business purposes, and the State of Florida's records clearly establish that they were separate corporations.  Mr. Higo also testified that he never saw any correspondence between Horgo Enterprises, Horgo Signature, and Mid-Continent concerning Horgo Signature's work on the Bradfield Home, and never saw any certificates of insurance issued with respect to Horgo Signature.  See Doc. 63-1, pp. 224-25; Doc. 92-1, pp. 180-184, 204.  Mr. Horvath also testified that Mid-Continent never issued any certificates of insurance naming Horgo Signature.  (Doc. 92-3, p. 95).

and undisputed, it would not trump the unambiguous language of the Winfree or Horgo Enterprises policies, and would not create a material issue of disputed fact sufficient to defeat summary judgment.[15]

The Bradfields make one last argument in their sur-response (Doc. 93). They now seek to argue that genuine issues of material fact exist as to whether Horgo Signature is an additional insured because an "insured contract" may in fact exist. The Winfree and Horgo Enterprises Policies list "a sidetrack agreement" as a possible "insured contract," (Doc. 32-1, p. 38; Doc. 32-2, p. 27; Doc. 32-3, p. 27; Doc. 63-21, p. 29; Doc. 63-22, p. 32; Doc. 63-23, p. 35; Doc. 63-24, p. 32), and the Bradfields contend that Horgo Enterprises and Horgo Signature may have entered into an oral "sidetrack agreement," but there is simply no evidence of such. Moreover, if an oral "sidetrack agreement" existed, it could not affect the written terms of the policies. See Doc. 63-

---

[15]The Bradfields also reference two exhibits attached to Mr. Winfree's deposition. The first is a handwritten letter from Mr. Winfree to the Bradfields' attorney, dated May 8, 2012, in which Mr. Winfree states that all subcontractors were paid for by Horgo Signature, and that "warranty and insurance was covered by Horgo Signature Homes." (Doc. 75-1, p. 97). This document, which is hearsay, does not establish or create an issue of fact as to whether Mid-Continent insured Horgo Signature, nor does it defeat the plain language of the Policies.

The other exhibit is even less persuasive. It is dated August 3, 2005 and is entitled "Horgo Signature Homes A Division of Horgo Enterprises 4367 S. Hwy 27 Clermont, FL 34711 'Exhibit C'" (Doc. 75-1, p. 98). The Court assumes that the Bradfields are referencing this document in an attempt to show that Horgo Signature and Horgo Enterprises are the same corporate entity and thus are both covered under the Horgo Enterprises Policy. Taking this document in the light most favorable to the Bradfields, it can be interpreted to mean that in August 2005 Horgo Signature was held out in at least one instance as a "division" of Horgo Enterprises; but this does not alter the undisputed fact that the two companies were separate corporate entities, that the only named insureds under any insurance policies are Winfree and Horgo Enterprises, and that the unambiguous policy language does not extend to cover Horgo Signature as an additional insured.

21, p. 37; Doc. 63-22, p. 39; Doc. 63-23, p. 42; Doc. 63-24, p. 42 (requiring that all insured contracts, including "sidetrack agreements" must be in writing).[16]

In summary, taking the undisputed material facts in the light most favorable to the Bradfields, the Court finds as a matter of law that Horgo Signature was not a named insured or additional insured under any policy issued by Mid-Continent during the relevant time period.  As such, Mid-Continent owed Horgo Signature no duty to defend or indemnify, and summary judgment will be granted in Mid-Continent's favor.

## III.   Mid-Continent's Coverage of Winfree

The Parties have filed cross-motions for summary judgment with respect to Mid-Continent's obligations to Winfree, and whether Mid-Continent must satisfy the Coblentz Consent Judgment against Winfree.  Under Florida law, where an injured party wishes to recover under a Coblentz agreement "the injured party must prove coverage, wrongful refusal to defend, and that the settlement was reasonable and made in good faith."  Chomat v. Northern Ins. Co. of New York, 919 So. 2d 535, 537 (Fla. 3d Dist. Ct. App. 2006) (quoting Quintana v. Barad, 528 So. 2d 1300, 1301 n. 1 (Fla. 3d Dist. Ct. App. 1988)) (additional citations omitted).  See also Trovillion Const.

---

[16]The Bradfields also appear to argue that Horgo Signature should be covered because the Horgo Enterprises Policy contained a Designated Construction Project Endorsement, which covers "all projects away from your premises where you are performing work."  See, e.g., Doc. 63-21, p. 38; Doc. 93, pp. 1-2.  This Endorsement however, clearly only provides coverage for the named insured or additional insured for various construction projects.  It does not create coverage for any other third parties.  And the fact that Horgo Enterprises may have been covered for any work done at the Bradfield Home is pure conjecture and of no moment.  The record evidence clearly shows that only Horgo Signature and Winfree worked on the home, and the Bradfields never brought suit against Horgo Enterprises.

& Dev., Inc. v. Mid-Continent Cas. Co., 2014 WL 201678 at * 3 (M.D. Fla. Jan. 17, 2014); Sinni v. Scottsdale Ins. Co., 676 F. Supp.2d 1391, 1324 (M.D. Fla. 2009).

The Bradfields seek summary judgment solely on the second element of their burden – that Mid-Continent breached its duty to defend Winfree in the Underlying Case (Doc. 28).   Mid-Continent seeks summary judgment on the remaining two elements – that there was no coverage (*i.e.,* no duty to indemnify), and that the Consent Judgment was not reasonable or made in good faith (Doc. 64). The Court will first address the Bradfields' motion.

The general rule in Florida is that an insurance company's duty to defend an insured is determined solely from the allegations of the complaint when compared to the insurance policy's terms and conditions.  See Jones v. Florida Ins. Guar. Ass'n, Inc., 908 So. 2d 435, 443 (Fla. 2005); National Union Fire Ins. Co. v. Lenox Liquors, Inc., 358 So. 2d 533, 536 (Fla. 1977).  When the complaint alleges facts that fairly and potentially bring the suit within the coverage afforded by the policy, the insurer must defend the action.  Jones, 908 So. 2d at 442-43.  "The duty to defend is of greater breadth than the insurer's duty to indemnify, and the insurer must defend even if the allegations in the complaint are factually incorrect or meritless." J.B.D. Constr., Inc. v. Mid-Continent Cas. Co., 571 Fed. Appx. 918, 926 (11th Cir. 2014) (quoting Jones, 908 So. 2d at 443).  Moreover, even "[i]f the complaint alleges facts that are partially within and partially outside the scope of coverage, the insurer is obligated to defend the entire suit."  Trizec Properties, Inc. v. Biltmore Constr. Co., Inc., 767 F.2d 810, 811-12 (11th

Cir. 1985) (citations omitted).  Indeed, an insurer may be required to defend a suit even

if it is later determined that there is no coverage.  Trizec, 767 F.2d at 812.  However,

while any doubts regarding the duty to defend must be resolved in favor of the insured,

"[a]n insurer has no duty to defend a lawsuit where the underlying complaint does not

allege facts that would bring the complaint within the coverage of the policy."  Auto-

Owners Ins. Co. v. Marvin Dev. Corp., 805 So. 2d 888, 891 (Fla. 2d Dist. Ct. App.

2001).

Following this body of law, the Bradfields argue that the allegations of their

complaint in the Underlying Case fairly and potentially bring their claims against

Winfree within policy coverage and, therefore, Mid-Continent had a duty to defend.[17]

According to the Bradfields, they have sufficiently alleged that Winfree's defective

construction of their home resulted in "property damage" that is covered by the Winfree

Policy.  The Bradfields further argue that their complaint in the Underlying Case fairly

and potentially avers that the property damage to their home occurred prior to the

expiration of the Winfree Policies.[18]

_____

[17]Even if there was a duty to defend but, ultimately no duty to indemnify, the damages flowing from a breach of the duty to defend would be limited to recovery of the litigation expenses incurred by the insured in defending the underlying action, including attorney's fees and costs. In that regard the Bradfields seek $20,333.55 in attorney's fees and $4,724.45 in costs for defending the Underlying Case.  (Doc. 2, Ex. H, p. 10).

[18]Relying on Mid-Continent's November 1, 2012 letter, the Bradfields' have asserted another argument:  that Mid-Continent went outside the four corners of the complaint in the Underlying Case in denying coverage.  However, the undisputed facts clearly show as a matter of law that Mid-Continent limited its analysis to the allegations of the complaint and its exhibits.
(continued...)

The first point of contention concerns whether the complaint in the Underlying Case fairly or potentially alleges that Winfree caused "property damage" as that term is defined in the Winfree Policy.  In order to understand this argument, a brief history of the purpose of Commercial General Liability Policies and the Florida Supreme Court's interpretation of the term "property damage" in such Policies is warranted.

### A.    The History of Commercial General Liability Policies in Florida

Commercial General Liability Policies are designed to protect an insured against certain losses arising out of business operations.  United States Fire Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 877 (Fla. 2007) (citations omitted).  The first standard form comprehensive general liability policy was drafted by the insurance industry in 1940.  Since that time, the standard form has been revised numerous times, with the coverage provisions expanding and the exclusions narrowing.  Id. at 878.  The coverage changed from merely covering "accidents" to also covering damages caused by an "occurrence."  During the same process, "business risk" exclusions were added to exclude from coverage:  (1) any property damage to the insured's products arising out of such products, and (2) any property damage to work performed by or on behalf of the insured caused by the insured's work or any portion thereof.  Id.  In addition, starting in 1976, insurers offered products completed operations hazard coverage,

_____

[18](...continued)
The November 1, 2012 letter was simply Mid-Continent's response to an earlier letter from the Bradfields' counsel, in which counsel claimed that he would soon present additional evidence establishing coverage.  It was not a declination of coverage letter.

which eliminated the exclusion for "work performed on behalf of the named insured" with respect to completed operations. Id. at 879.

The most recent revisions to Commercial General Liability Policies took place in 1986. These revisions modified the business risk exclusions to include the j(5) and j(6) exclusions eliminating coverage for:

> j(5)   That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

> j(6)   That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.[19]

The 1986 revisions also added a new "your work exclusion" with an exception for subcontractor work:

> l.   "Property damage" to "your work" arising out of it or any part of it and included in the "products completed operations hazard."
>
> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

The Supreme Court of Florida first addressed the definition of "property damage" in Commercial General Liability Policies in a 1980 decision, LaMarche v. Shelby Mut. Ins. Co., 390 So. 2d 325 (Fla. 1980). LaMarche dealt with a pre-1986 Commercial General Liability Policy, but the facts of LaMarche are strikingly similar to those in this

---

[19]Exclusion j(6) does not apply to "property damage" included in the "products completed operations hazard."

case.  A general contractor built a residential home, and the homeowners claimed that

the work was deficient, resulting in structural defects and other related damages.  The

contractor was insured under a Commercial General Liability Policy that contained

exclusions for:  (1) "property damage to the named insured's products arising out of

such products or any part of such products;" and (2) "to property damage to work

performed by or on behalf of the named insured arising out of the work or any portion

thereof, or out of materials, parts or equipment furnished in connection therewith."

LaMarche, 390 So. 2d at 326.  Thus, the question before the Florida Supreme Court

was whether coverage included payment for the cost of replacing defective materials

and workmanship.

The LaMarche Court determined that coverage did not exist based on the

applicable exclusions.  In so holding, the Florida Supreme Court noted that the purpose

of Commercial General Liability Policies was "to provide protection for personal injury

or for property damage caused by the completed product, but not for the replacement

and repair of that product."  390 So. 2d at 326.

> To interpret the policy as providing coverage for construction
> deficiencies, as asserted by the petitioners and a minority of states, would
> enable a contractor to receive initial payment for the work from the
> homeowner, then receive subsequent payment from his insurance
> company to repair and correct deficiencies in his own work.  We find this
> interpretation was not the intent of the contractor and the insurance
> company when they entered into the subject contract of insurance, and
> the language of the policy clearly excludes this type of coverage.  Rather
> than coverage and payment for building flaws or deficiencies, the policy
> instead covers damage caused by those flaws.  We agree with the
> explanation of this type of coverage as stated by the Supreme Court of

New Jersey in <u>Weedo v. Stone-E-Brick, Inc.</u>, 81 N.J. 233, 405 A.2d 788 (1979), in which it said:

> An illustration of this fundamental point may serve to mark the boundaries between "business risks" and occurrences giving rise to insurable liability.  When a craftsman applies stucco to an exterior wall of a home in a faulty manner and discoloration, peeling and chipping result, the poorly-performed work will perforce have to be replaced or repaired by the tradesman or by a surety.  On the other hand, should the stucco peel and fall from the wall, and thereby cause injury to the homeowner or his neighbor standing below or to a passing automobile, an occurrence of harm arises which is the proper subject of risk-sharing as provided by the type of policy before us in this case.  405 A.2d at 791-92.

<u>Id.</u> at 326-27.

Sequentially, the Florida Supreme Court's next discussion of the definition of "property damage" took place in 2007.  In <u>United States Fire Ins. Co. v. J.S.U.B., Inc.</u>, 979 So. 2d 871 (Fla. 2007), the Court dealt with a post-1986 Commercial General Liability Policy which included the j(5) and j(6) exclusions, as well as products completed operations hazard coverage – in other words, a policy virtually identical to the Winfree Policy.   The insured in <u>J.S.U.B.</u>, like Winfree, was a general contractor who built residential homes that later showed signs of damage.  Where <u>J.S.U.B.</u> differs slightly from the present case is the conflict at issue:  <u>J.S.U.B.</u> involved the question of whether a Commercial General Liability Policy provided coverage when a claim was made against a general contractor (the insured) for damage to the completed project caused by a subcontractor's defective work.  979 So. 2d at 874-75.

-35-

The <u>J.S.U.B.</u> Court answered this question in the affirmative.  In so doing, the Court made several pronouncements that are of particular relevance to the definition of "property damage" applicable to all claims, including those against general contractors.  Significantly, the Court recognized the "difference between a claim for the costs of repairing or removing defective work, which is not a claim for 'property damage,' and a claim for the costs of repairing damage caused by the defective work, which is a claim for 'property damage.'" 979 So. 2d at 889.

> [F]aulty workmanship or defective work that has damaged the otherwise nondefective completed product has caused "physical injury to tangible property" within the plain meaning of the definition in the policy.  If there is no damage beyond the faulty workmanship or defective work, then there may be no resulting "property damage."

<u>Id.</u>  The Court then held that because the case involved a claim for repairing the collateral structural damage to the completed homes and not a claim for the cost of repairing the subcontractor's defective work itself, that "property damage" existed that was covered under the policy.  <u>Id.</u> at 890.

The <u>J.S.U.B.</u> Court also took care to distinguish, but not recede from, its prior ruling in <u>LaMarche</u>.  The Court noted that <u>LaMarche</u> involved a pre-1986 Commercial General Liability Policy and, more significantly, addressed coverage for a contractor's own defective work rather than the work of a subcontractor.  <u>J.S.U.B.</u>, 979 So. 2d at 891.

The Florida Supreme Court's next and most recent decision addressing the definition of "property damage" in Commercial General Liability Policies was rendered

the very next year.  In <u>Auto-Owners Ins. Co. v. Pozzi Window Co.</u>, 984 So. 2d 1241

(Fla. 2008), a homeowner contracted to build a home, and purchased custom windows

from a retailer that were manufactured by Pozzi Window Company (the insured) and

installed by a subcontractor.  After moving in, the homeowner complained of water

leakage around the windows as well as water damage to other areas.  However, it was

not clear whether the damage was due to defective installation or defective design and

manufacture of the windows, or both.  <u>Pozzi</u>, 984 So. 2d at 1243-44.  The manufacturer

was insured under a Commercial General Liability Policy with provisions and

exclusions nearly identical to those in the Winfree Policy.   The insurer provided

coverage for property damage caused by the leaking windows, but refused to provide

coverage for the cost of repair or replacement of the windows, arguing that such costs

did not constitute "property damage."

Following the rationale of <u>J.S.U.B.</u>, the <u>Pozzi</u> Court held that "the mere inclusion

of a defective component, such as a defective window or the defective installation of

a window, does not constitute property damage unless that defective component

results in physical injury to some other tangible property."  <u>Pozzi</u>, 984 So. 2d at 1248.

Accordingly, if the claim in this case is for the repair or replacement
of windows that were defective both prior to installation and as installed,
then that is merely a claim to replace a "defective component" in the
project."  As the Supreme Court of Tennessee recently explained:

[A] "claim limited to faulty workmanship or materials" is one
in which the sole damages are for replacement of a defective
component or correction of faulty installation. . . .  [The
contractor's] subcontractor allegedly installed the windows

> defectively. *Without more, this alleged defect is the equivalent of the "mere inclusion of a defective component" such as the installation of a defective tire, and no "property damage" has occurred.*

Travelers Indem. Co. of Am. v. Moore & Assocs., Inc., 216 S.W.3d 302, 310 (Tenn. 2007) (emphasis supplied). Because the Subcontractor's defective installation of the defective windows is not itself "physical injury to tangible property," there would be no "property damage" under the terms of the CGL policies. Accordingly, there would be no coverage for the costs of repair or replacement of the defective windows.

Conversely, if the claim is for the repair or replacement of windows that were not initially defective but were damaged by the defective installation, then there is physical injury to tangible property. In other words, because the windows were purchased separately by the Homeowner, were not themselves defective, and were damaged as a result of the faulty installation, then there is physical injury to tangible property, *i.e.*, windows damaged by defective installation. Indeed, damage to the windows themselves caused by the defective installation is similar to damage to any other personal item of the Homeowner, such as wallpaper or furniture. Thus, coverage would exist for the cost of repair or replacement of the windows because the Subcontractor's defective installation caused property damage.

979 So. 2d at 1248-49.[20]

---

[20]The Florida Supreme Court reviewed Pozzi based on a certified question from the Eleventh Circuit Court of Appeals. Because the record contained a factual issue as to whether the defective work was limited to the faulty installation or whether the windows themselves were defective, the Court returned the case to the Eleventh Circuit for further analysis. The Eleventh Circuit issued an opinion holding that "property damage" had occurred because, despite a confusing factual record, the insured had waived any claim that the windows were defective. Pozzi Window Co. v. Auto-Owners Ins., 294 Fed. Appx. 588, 590-91 (11th Cir. 2008). Thus, the Eleventh Circuit determined that the subcontractor's faulty installation of the windows caused "property damage" for the repair and replacement of the windows. Id.

**B.      Application of Florida Law to the Present Case**

Following Florida law, analysis of this case therefore turns on the question of whether the Bradfields' complaint in the Underlying Case alleged damages only for the cost of repairing or replacing the work performed by Winfree, or whether the complaint alleged damages for repairing other property that suffered damage due to Winfree's faulty workmanship.   The Court finds that even under the most liberal and broadest of readings, the complaint only alleges damages for the cost of repairing or replacing defective work performed by Winfree and/or defective materials installed by Winfree and, as such, there was no "property damage" covered by the Winfree Policy.

The complaint alleges that the Bradfield home "suffers from latent construction defects that materially affect the structural integrity" of the home.  (Doc. 25-1, ¶ 12).[21] Eight categories of latent defects are then listed:  (a) water intrusion on the tile roof, windows, and pool bath; (b) mold; (c) code violations in the garage drywall; (d) improper sloping on the front balcony; (e) improper installation of the air handler and windows; (f) improper ceiling installation; (g) improper installation of combustible materials in the summer kitchen; and (h) improper installation of roofing materials, (Id., ¶ 13).

---

[21]Although paragraph 12 of their complaint is part of the breach of contract claim against Horgo Signature, the Bradfields incorporated this allegation into their negligence claim against Winfree (Doc. 25-1, ¶ 19).   The allegation concerning the structural integrity of the home is discussed *infra*, p. 43.

The complaint next states that the latent defects "are more fully identified" in the Endeavour Report, which is attached to the complaint as an exhibit (Id., ¶ 14).   That Report, however, merely lists nine (9) categories of items that were either improperly installed, or were installed with improper materials.  For example, the Report states that "it is believed the roof tiles were not installed in accordance to code or specifications show [sic] on the plans" resulting in leaks to the roof, and were missing metal clips on the "starter row" of the roof.  (Doc. 28-1, Ex. B, p. 2 and attached Oviedo Roofing Report).  The Endeavour Report also lists the installation of potentially toxic drywall, which would need to be replaced; a belief that the windows "have not been installed per manufacturer specifications;" the use of the wrong thickness of drywall (1/2 inch instead of 5/8 inch), which is "a major code violation;" an improperly sloped front balcony that will require replacement; improper installation of the pool decking which "can be fixed by removal of the decking and re-elevating the same" or "installing a drain;" improper finishing of the a/c handler expansion with plywood instead of the same materials used in the rest of the home; and a belief that the construction materials used to install the summer kitchen "pose a fire hazard."   (Id., pp. 2-9).

None of these categories of purported defects discuss any damage to any other portion of the Bradfield Home.  For example, there is no mention of damage to floors, walls, ceilings, cabinetry, doors, or appliances, in fact the word "damage" is never used in the Report at all.  And while the Endeavour Report mentions the phrase "water intrusion" there is no explanation anywhere of what "water intrusion" means, and more

importantly, (and redundantly) there is no discussion of what portions of the Bradfield Home were damaged by this "water intrusion."[22] Rather, each category is limited solely to claims that Winfree used the wrong materials (drywall, a/c handler plywood, combustible materials on the summer kitchen), or that Winfree potentially installed portions of the home incorrectly (windows, front balcony, pool decking), resulting in damage solely to the improperly installed item (roof leaks due to improperly installed roof).  Under LaMarche, J.S.U.B.,and Pozzi, it is thus clear that the complaint in the Underlying Case only sought damages for the repair and replacement of defective materials and/or defective work performed by Winfree.  Such claims do not constitute "property damage" that is covered under the Winfree Policy, and therefore Mid-Continent did not have a duty to defend Winfree.[23]

---

[22]The Endeavour Report contains some photographs which purport to show that the wrong thickness of drywall was used as well as the wrong materials for the a/c handler and summer kitchen.  There are also two photographs of windows, one photo of the front balcony, and two photos of the pool bath.  (Doc. 28-1, Ex. B, pp. 2-9).  None of these photographs show any damage to other tangible property aside from the defective work performed by or on behalf of Winfree.

[23]The Endeavor Report lists a 10th category of latent defects, entitled "mold issues." (Doc. 28-1, Ex. B, p. 2).  However, all "property damage" "arising out of, resulting from, caused by, contributed to, attributed to, or in any way related to any . . . mold," as well as all costs and expenses associated in any way with the "abatement, mitigation, remediation, containment, detoxification, neutralization, monitoring, removal, disposal, or any obligation to investigate or assess the presence or effects of any . . . mold" are expressly excluded from coverage under the Winfree Policy. (Doc. 32-1, p. 40; Doc. 32-2, p. 41; Doc. 32-3, p. 45). See e.g., Pennsylvania Nat. Mut. Cas. Ins. Co. v. The Retirement Sys. of Alabama, 2015 WL 1810463 (N.D. Ala. Apr. 21, 2015) (finding no duty to defend where mold exclusion barred coverage).

This result is further supported by the Eleventh Circuit Court of Appeals decision in Amerisure Mut. Ins. Co. v. Auchter Co., 673 F.3d 1294 (11th Cir. 2012), in which Florida law supplied the rule of decision.  Auchter involved a Commercial General Liability Policy identical to the Winfree Policy.  A general contractor (the insured) was hired to build an inn and conference center.  It subcontracted the roof installation.  The roof was improperly installed, and over the ensuing years, concrete tiles dislodged from it.  Ultimately the entire roof required replacement.  The insurer argued that there was no coverage because the replacement of a defectively installed roof did not equate to "property damage."

Relying on J.S.U.B. and Pozzi, the Court of Appeals held that there is a distinction in Florida "between a claim for the cost of repairing the subcontractor's work, which is not covered under a [Commercial General Liability Policy], and a claim for repairing the structural damage to the completed [project] caused by the subcontractor's defective work, which is covered."   Auchter, 673 F.3d at 1306 (emphasis in original) (quoting J.S.U.B., 979 So. 2d at 890).  The Court of Appeals further held that "nondefective and properly installed raw materials can constitute a defective project component when the contract specifications call for the use of different materials, yet the cost to reinstall the correct materials is not 'property damage' — even though the remedy for such a nonconformity is to remove and replace that component of the project."  Id.

This is the exact circumstance presented in this litigation.  The Bradfields alleged in their Underlying Case defects in the form of repair and replacement of improper and/or defective materials, improper installation, and the use of materials that do not comport with building codes and/or plan specifications.  As in Auchter, such claims are not "property damage."   And the Bradfields inclusion in the complaint of the conclusory phrase "latent construction defects that materially affect the structural integrity" of the home (Doc. 28-1, ¶ 12) does not establish a duty to defend absent any allegations that the various latent defects damaged some specific non-defective portion of the Bradfield home.  See Auchter, 673 F.3d at 1307 ("Although the loss of roof tiles may be said to have 'damaged' the structural integrity of the roof, thereby rendering it defective, 'there is no damage beyond the faulty workmanship' because the defective roof has not damaged some 'otherwise nondefective' component of the project.") (quoting J.S.U.B., 979 So. 2d at 889).[24]  Here, the Bradfields' bald allegation that they "suffered damages" is equally unavailing.  See Home Owners Warranty Corp. v. Hanover Ins. Co., 683 So. 2d 527, 528 n. 2 (Fla. 3rd Dist. Ct. App. 1996) (finding, in part, that an allegation requesting compensation "for damages caused by defects and deficiencies," without otherwise stating what such damages consist of, does not equate to "property damage" under a Commercial General Liability Policy and does not create a duty to defend).

_____

[24]See also Fun Spree Vacations, Inc. v. Orion Ins. Co., 659 So. 2d 419 (Fla. Dist. Ct. App. 1995), and Wackenhut Servs., Inc. v. National Union Fire Ins. Co. Of Pittsburgh, 15 F. Supp. 2d 1314 (S.D. Fla. 1998), both of which hold that courts cannot infer a duty to defend when key elements of a claim are not alleged in the complaint.

In sum, relying solely on the four corners of the Bradfields' complaint in the Underlying Case,[25] and applying the binding precedent of Florida and the Eleventh Circuit, the Court finds that Mid-Continent did not have a duty to defend Winfree. The claimed defects and resulting damages relate solely to the repair and replacement of defective work and/or defective materials, which do not fall within the Policy's definition of "property damage." And any claimed damages relating to mold are excluded by the Policy's mold exclusion. Accordingly, the Bradfields' motion for summary judgment will be denied. Because the existence of a duty to defend is a key element in establishing liability under a Coblentz agreement, see Chomat, 919 So. 2d at 537, the Court further finds that Mid-Continent is entitled to summary judgment on its motion because the undisputed facts establish as a matter of law that Mid-Continent is not obligated to satisfy the MSA and Consent Judgment.[26]

---

[25]Though obvious, it is important to remember that the pleading deficiencies critical to this analysis are not and were not subject to correction by amendment when this case was filed. The Bradfields' complaint in the Underlying Case had been settled by the Coblentz agreement and the resulting judgment, and that complaint, as it was and is, alone governs Mid-Continent's duty to defend and duty to indemnify.

[26]Having found that the Bradfields' complaint did not allege "property damage," the Court "need not determine whether any policy exclusions or exceptions apply." Auchter, 673 F.3d at 1310. However, if the Court were to have found that the Underlying Case alleged property damage, it bears noting that summary judgment would have been granted in the Bradfields' favor as to the duty to defend. The mold exclusion by itself would not defeat coverage for all claimed damages. Trizec, 767 F.2d at 811-12 ("[i]f the complaint alleges facts that are partially within and partially outside the scope of coverage, the insurer is obligated to defend the entire suit."). The CG 2294 Endorsement which excludes work performed by subcontractors did not exist in the first Winfree Policy, thus any damages/defects that occurred before the expiration of the first policy term (May 23, 2006) would still potentially be covered, and it is not clear from the complaint when
(continued...)

While this would normally be the end of this case, the Court will, out of an abundance of caution, address the remaining two requirements for enforcing a <u>Coblentz</u> agreement:  coverage, and that the agreement is reasonable and/or made in good faith.[27]

## IV.   **Mid-Continent's Other Defenses**

Mid-Continent argues that it has no duty to indemnify Winfree, and the <u>Coblentz</u> agreement between the Bradfields and Winfree is unreasonable because:  (1) the MSA and the Consent Judgment improperly hold Winfree and Horgo Signature jointly and severally liable for the purported damages to the Bradfield Home; (2) all damages listed in the MSA and the Consent Judgment are excluded from coverage under the Winfree Policy's  j(5), j(6), and/or mold exclusions; (3) the MSA and the Consent Judgment do not allocate damages between those covered by the Winfree Policy and those not

---

[26](...continued)
the damages/defects occurred.  Lastly, Mid-Continent's arguments that any damages would have occurred for purposes of coverage on their manifestation date (April 2012), after all of the Winfree Policies had expired, is squarely foreclosed by the recent Eleventh Circuit decision in <u>Carithers v. Mid-Continent Cas. Co.</u>, 782 F.3d 1240 (11th Cir. 2015) (holding that the proper "trigger date" to use for an "occurrence" in Commercial General Liability Policies identical to the Winfree Policy is the "injury in fact" date).

[27]The Court exercises this caution because it is aware of at least one pre-<u>J.S.U.B.</u> and pre-<u>Pozzi</u> Florida district court of appeals decision which held that an allegation that the installation of defective windows and the improper construction of windows, window sills, and exterior walls, which caused "severe water infiltration" created "potential coverage" under a Commercial General Liability Policy and a duty to defend the claim.  <u>Biltmore Const. Co., Inc. v. Owners Ins. Co.</u>, 842 So. 2d 947, 949 (Fla. 2d Dist. Ct. App. 2003).

covered; and (4) the MSA and the Consent Judgment are not reasonable, were not entered into in good faith, and/or are the product of collusion.

Before reaching any of these issues, the Court must first address the Bradfields' contention that Mid-Continent has waived all of its arguments but one.  According to the Bradfields, if Mid-Continent breached its duty to defend Winfree in the Underlying Case, the only argument Mid-Continent can now raise to defeat coverage is that the MSA and Consent Judgment were unreasonable or procured by fraud or collusion.

To support this argument, the Bradfields cite to a Florida Supreme Court decision, Jones v. Florida Ins. Guar. Ass'n., Inc., 908 So. 2d 435 (Fla. 2005).  In Jones, the insured was involved in a two-vehicle automobile accident that resulted in the death of the driver of the other vehicle.  The estate of the decedent filed a wrongful death action, and the insurance company refused to defend the insured.  The estate eventually received a judgment against the insured in the amount of $75,000,000, which it then attempted to collect from the insurance company.  908 So. 2d at 438-40. The state courts, including the Florida Supreme Court, ultimately determined that the insurance company did in fact have a duty to defend the insured.  The insurance company then sought to defeat liability by asserting a host of defenses, including an argument that the insured was not the owner of the vehicle at the time of the accident. The Florida Supreme Court held that the insurance company was precluded from challenging any factual issues (such as ownership of the vehicle) that were integral to the underlying judgment:

> It is well settled that 'where an indemnitor has notice of a suit against his indemnitee and is afforded an opportunity to appear and defend, a judgment therein rendered against the indemnitee, if without fraud and collusion, is conclusive against the indemnitor as to all material questions therein determined.' Grain Dealers Mut. Ins. Co. v. Quarrier, 175 So. 2d 83, 86 (Fla. Dist. Ct. App. 1965); see also Martino v. Florida Ins. Guar. Ass'n., 383 So. 2d 942, 944 (Fla. Dist. Ct. App. 1980) . . . .  By virtue of that rule, an insurer . . . may be free to challenge properly pled issues pertaining to fraud in the procurement of the insurance policy or the insured's alleged breach of an essential condition of the policy.  However, questions such as identity, negligence, and other factual issues, which were interwoven with and a necessary and integral part of the determination of judgment in the underlying action are precluded from further review and subsequent collateral attack.  See Quarrier, 175 So. 2d at 86.

Jones, 908 So. 2d at 450.

Thus, when an insurance company refuses to defend its insured in an underlying action, the insurer loses its ability to challenge the merits of the judgment, which is conclusive of any fact central to the elements of the claim made by the injured party against the insured, or any defense that might have been asserted against that claim. Contrary to the Bradfields' position, however, the insurer can still defend in subsequent proceedings whether the judgment is recoverable under the terms of the insurance policy, or whether the judgment is reasonable in amount or the product of fraud or collusion.  See Mid-Continent Cas. Co. v. American Pride Bldg. Co., LLC, 534 Fed. Appx. 926, 928 (11th Cir. 2013); Trovillion, 2014 WL 210678 at * 6-7.  "Indeed, the mere entry of a consent judgment does not establish coverage and an insurer's unjustifiable failure to defend the underlying action does not estop the insurer from raising coverage issues in a subsequent suit to satisfy a consent judgment entered

pursuant to a Coblentz agreement." <u>Sinni v. Scottsdale Ins. Co.</u>, 676 F. Supp. 2d 1319, 1324 (M.D. Fla. 2009) (citation omitted).  The notion is that the settlement establishes the insured 's liability, but not the insurer's obligation of coverage.  <u>See</u> <u>Ahern v. Odyssey Re (London) Ltd.</u>, 788 So. 2d 369, 372 (Fla. 4th Dist. Ct. App. 2001).

Following this doctrine, and assuming arguendo that Mid-Continent breached its duty to defend Winfree, the Court finds that Mid-Continent is precluded from challenging liability for the MSA and Consent Judgment on the basis that joint and several liability does not exist in negligence actions in Florida.  <u>See</u> Fla. Stat. §768.81(3).  That argument relates to the merits or validity of the Bradfields' judgment against Winfree, and does not relate to issues of insurance coverage under the Winfree Policy.  Mid-Continent chose to forego this argument when it refused to defend Winfree in the Underlying Case and may not assert it here.  However, Mid-Continent has not waived its arguments concerning whether the damages claimed are covered by the Winfree Policy.

## A.    Is the Consent Judgment Excluded from Coverage?

"Florida law clearly states that liability of an insurer depends upon whether the insured's claim is within the coverage of the policy.  This remains true even when the insurer has unjustifiably failed to defend its insured in the underlying action." <u>Spencer v. Assurance Co. of Am.</u>, 39 F.3d 1146, 1149 (11th Cir. 1994).  "A determination of coverage, therefore, is a condition precedent to any recovery against an insurer." <u>Id.</u>

(citing <u>Steil v. Fla. Physicians' Ins. Reciprocal</u>, 448 So. 2d 589, 592 (Fla. 2d Dist. Ct. App. 1984)).

As this Court previously stated:

While the duty to defend is broad and must be determined solely by the allegations in the complaint against the insured, the duty to indemnify is more narrow and must be measured by the facts adduced at trial or developed through discovery taken during the underlying tort action. Therefore, notwithstanding the allegations against the insured, if the facts show that the insured's liability stems from a claim for which no coverage is provided under the policy, the insurer owes no duty of indemnification. This premise holds true even where, as here, the insured's liability was arrived at through a settlement of the action against the insured, because a settlement does not, by itself, obligate the insurer to pay for a non-covered claim.  Instead, the insurer's duty to indemnify a settlement obligation must be measured by the facts "inherent in the settlement" or, in other words, the facts extant at the time the settlement was reached.

<u>Travelers Indem. Co. of Illinois v. Royal Oak Enterprises, Inc.</u>, 344 F. Supp. 2d 1358, 1366 (M.D. Fla. 2004).  <u>See</u> <u>also</u> <u>Northland Cas. Co. v. HBE Corp.</u>, 160 F. Supp. 2d 1348, 1360 (M.D. Fla. 2001) (the duty to indemnify depends upon actual coverage "measured by the facts as they unfold at trial or are inherent in the settlement agreement.").

Assuming, arguendo, that the complaint in the Underlying Case had properly alleged "property damage," and that a material issue of fact existed as to whether Winfree's defective workmanship caused such property damage to other portions of the home, Mid-Continent argues that based on the facts as they existed at the time of the creation of the MSA, all of the Bradfields' damages are excluded from coverage by the

Winfree Policy's j(5), j(6) and mold exclusions.  The Bradfields did not address this argument in their motion papers.

As previously discussed, the j(6) exclusion, when read *in pari materia* with the products completed operations hazard coverage, precludes coverage for the costs of repairing, removing, and/or replacing defective work that occurs while the insured is still performing operations.  See J.S.U.B., 979 So. 2d at 889; Pozzi, 984 So. 2d at 1248-49; Auchter, 673 F.3d at 1306.  The j(5) exclusion precludes coverage for damages to that particular part of real property that occur while the insured (or anyone working on the insured's behalf) is performing operations.  Thus, for these exclusions to apply to deny coverage, the undisputed material facts must demonstrate: (1) that the property damage began while Winfree was still performing operations, *i.e.*, before construction on the Bradfield home was completed; and either (2) that the property damage was caused by work that Winfree was still performing; or (3) that the claimed damages are only for the repair, removal, or replacement of defective work.[28]  See Oak Ford Owners Ass'n v. Auto-Owners Ins. Co., 510 F. Supp. 2d 812, 819 (M.D. Fla. 2007) ("Exclusions [j(5) and j(6)] operate in tandem, excluding coverage for property damage arising from ongoing work and for repair or restoration of property because of deficient work. . . .

_____

[28]Florida courts have held that these exclusions are unambiguous and are enforceable according to their terms.  See American Equity Ins. Co. v. Van Ginhoven, 788 So. 2d 388, 391 (Fla. 5th Dist. Ct. App. 2001); U.S. Fire. Ins. Co. v. Meridian of Palm Beach Condo. Ass'n, Inc., 700 So. 2d 161, 162 (Fla. 4th Dist. Ct. App. 1997).

These exclusions do not apply, however, to off-premises property damage arising from *completed* work.") (emphasis in original).

The undisputed material facts in this case establish that construction on the Bradfield home was completed no later than December 13, 2006, when the Lake County Building Department issued its Certificate of Occupancy (Doc. 63-5).  The undisputed facts further establish that Winfree entered into an oral agreement with Horgo Signature for Winfree to serve as the residential general contractor for the entire home, and Winfree did so.[29]

The Court has carefully reviewed the record evidence concerning when the alleged property damage first arose.[30]  Mr. Swidler, the owner and head of the Endeavour Group, and the person who conducted the inspections of the Bradfield Home, opined at his deposition that all of the property damage to the home "started day one" as soon as construction commenced.  (Doc. 64-15, pp. 25-26).[31]  Mr. Clark, the

---

[29]While there is evidence that a large portion of the construction was performed by subcontractors, it cannot be refuted that at all times Winfree was the residential general contractor for the entire Bradfield Home.

[30]The Court is aware that the Bradfields are relying on the reports and testimony of Mr. Swidler, Mr. Clark, and Mr. Lougheed, and that <u>Daubert</u> motions have been filed with respect to Mr. Swidler and Mr. Lougheed.  Resolution of these motions would not change the Court's granting of summary judgment in favor of Mid-Continent.  Even if the Court were to grant the <u>Daubert</u> motions, the unchallenged testimony of Mr. Clark would remain that the damages began during Winfree's ongoing operations.

[31]Mr. Swidler also opined in his supplemental report to the Bradfields "that the property damage began during construction by reason of the defective workmanship to the windows and doors."  (Doc. 83-9, p. 3).

person retained by Mr. Swidler to provide an estimate for the repairs to the Bradfield

Home, also inspected the home and testified that all of the damages started when the

windows were installed (Doc. 64-16, p. 46).  More specifically, Mr. Clark provided an

estimate and supplemental report, in which he said:

> This property damage was due to improper construction and defective installation of the materials at the time of installation of these items and, due to the scope and nature of the identified damage both in 2012 and 2014, it is my opinion that the property damage began to occur upon the installation of the windows which allowed water damage to occur even before the sheetrock was installed.

(Doc. 72, p. 6).[32]  In addition, much of the damages claimed are to replace non-

conforming or improper materials (such as the wrong thickness of drywall, the wrong

materials for the summer kitchen and the a/c handler).  Those damages would

obviously have occurred at the moment of installation, *i.e.*, during Winfree's ongoing

operations.

There is nothing in the record before the Court suggesting that the property

damage to the Bradfield home began at any other point in time.  Based on this

undisputed evidence, consisting of testimony and opinions from the Bradfields' own

witnesses, it is clear that the property damage to the Bradfield Home arose from

Winfree's ongoing work.

---

[32]The Bradfields have also submitted the expert report of Alan Lougheed, in which he also opines that defects and damages began as early as 2005, and that "damages have continued to grow since the expiration of the [first building permit] and completion of the original Work on May 20, 2006, under the original permit." (Doc. 77, p. 21).

The Court also finds that the claimed property damage either consists of the costs of repairing or replacing Winfree's defective work, or arose out of that particular part of the Bradfield Home on which Winfree was working at the time the damage occurred.  See Container Corp. of America v. Maryland Cas. Co., 707 So. 2d 733, 736-37 (Fla. 1998)  (applying dictionary definition of "operation" and construing it to mean, in the context of a commercial general liability policy, work done in the performance of the insured contractor's contract with the owner); E.H. Spencer & Co., LLC v. Essex Ins. Co., 944 N.E.2d 1094 (Mass. App. Ct. Apr. 8, 2011) (noting that the j(5) and j(6) "business risk" exclusions apply in the home construction context such that "[w]here an insured is a builder of homes, as is the case here, the *entire* house is considered the product of the builder.  Thus, the exclusions serve to deny coverage when the insured builder or its subcontractor has caused any damage to the home itself.") (internal quotations omitted) (emphasis in original).  And even if the "particular part of real property" is given a more narrow definition, the Bradfields' witnesses have testified that the property damage commenced upon installation of the windows.  The windows were installed by an unidentified subcontractor, (see Doc. 75, p. 99), however, the j(5) exclusion applies to work performed by subcontractors.

This conclusion is buttressed by several state and federal decisions.  For example, in American Equity Ins. Co. v. Van Ginhoven, 788 So. 2d 388 (Fla. 5th Dist. Ct. App. 2001), a general contractor was hired to make minor repairs to the surface of a swimming pool.  The contractor negligently drained the pool, and the water table

-53-

pressure caused the pool to pop out of the ground, resulting in damage to the pool, pump, heating system, deck, screen enclosure, and the surrounding landscape and sprinkler system.  The general contractor's insurer admitted coverage for all damage except for damage to the pool itself.  Applying the j(5) and j(6) exclusions, the state court agreed:

> Specifically, the term "real property" is modified by the terms "on which you ... are performing operations."  At trial, Van Ginhoven admitted that when the pool popped, he was draining the pool, and thus working on, or performing operations on the pool.  Therefore, this exclusion bars coverage for property damage to "that particular part of real property on which [Van Ginhoven] ... was [performing operations]."  Similarly, the term "all property" is modified by the terms "your work was incorrectly performed on it."  In other words, the exclusion applies to all property on which work was incorrectly performed.  In his corrected final judgment, the trial judge found that "Van Ginhoven drained the swimming pool in a negligent manner, causing it to 'pop' or 'float'."  Accordingly, the term "all property" clearly refers to the pool because Van Ginhoven incorrectly performed work on it.

788 So. 2d at 391.

Relying on Van Ginhoven, the Southern District of Florida similarly interpreted the j(5) and j(6) exclusions to preclude coverage for damages arising out of the particular part of the property on which the insured was working, even if that particular part of property was not precisely what the insured was hired to work on.

> Here, American Cutting was hired to chip concrete to enlarge concrete holes.  This is analogous to Van Ginhoven being hired to perform a discrete repair on the pool.  Just like Van Ginhoven had to drain the pool to complete the repair, American Cutting had to work on concrete floor areas that included embedded cable to chip the concrete.  American Cutting was working on the area of concrete that included embedded cable when the cable was damaged.  This is similar to Van Ginhoven

working on the entire pool when the pool was damaged. All of the damages alleged in the counterclaim against American Cutting deal with the damage to the cable. Consequently, damage to the cable is excluded under the policies. The damages for having to break through walls or floors or paying workers overtime are also excluded because the walls and floors were only damaged to gain access to the damaged cable and the workers were only paid overtime because of the delay stemming from the damaged cable. These areas were not independently damaged as a result of American Cutting's activities. Consequently, there are no genuine issues of material fact, and exclusion j(5) of the CGL Policy . . . appl[ies] to the insured's claim for coverage. Plaintiffs have no duty to defend and therefore no duty to indemnify American Cutting or any insured in the State Court Action.

Amerisure Mut. Ins. Co. v. Am. Cutting & Drilling Co., 2009 WL 700246, at *6 (S.D. Fla. Mar. 17, 2009).[33]

And most recently, the Chief Judge of this District issued an opinion discussing in detail the application of the j(5) exclusion and Van Ginhoven. Essex Ins. Co. v. Kart Constr., Inc., 2015 WL 4730540 (M.D. Fla. Aug. 10, 2015). Chief Judge Merryday held that "under Florida law, Section (j)(5) excludes from coverage only damage to the part of the real property on which the insured is operating at the moment of accident." 2015 WL 4730540 at * 4.[34]

---

[33]See also Nova Cas. Co. v. Willis, 39 So. 3d 434, 436-37 (Fla. 3d Dist. Ct. App. 2010). Here, the insured was hired to trim mangrove trees on private property. Instead, the insured trimmed trees to the wrong height and also cut trees on neighboring state property. Applying the j(5) and j(6) exclusions, the state court held that the trees trimmed to the wrong height were not covered, because it was the result of faulty workmanship as part of the operations contracted for by the parties. The trees cut on state property however, were covered because they were not part of the insured's operations.

[34]Kart Constr., involved the construction of a 127-foot cell tower which caught fire. At the time the fire occurred, the insured was performing welding operations on a ten-foot portion of the
(continued...)

Applying these decisions to the present case, the Court concludes that at the time the purported property damage occurred, Winfree was working on the entire house, including the windows, and thus all property damage that arose from that work is excluded under the j(5) exclusion.  To the extent there is any other property damage, the Court further finds that the j(6) exclusion would operate to preclude coverage.  Any claims for replacement of  non-conforming or improper materials (such as the wrong thickness of drywall, the wrong materials for the summer kitchen and the use of plywood for the a/c handler) would clearly constitute the repair or replacement of defective or improperly performed work.  And the undisputed record evidence distills that the pool and pool deck were not constructed by Winfree, but were installed by another company several years after the Bradfields moved into the home.[35]

The Court thus finds that the j(5) and j(6) exclusions operate to preclude coverage for all of the property damage claimed by the Bradfields, and Mid-Continent is entitled to summary judgment in its favor.

---

[34](...continued)
tower.  Judge Merryday determined that at the time of the accident, Kart was only performing operations on this ten-foot portion, and thus this was the only part of real property that was excluded from coverage.

[35]The Court also notes, as discussed _supra_, that the mold exclusion would exclude coverage for any damages arising out of or related to mold in the Bradfield Home.

**B.** **Failure to Allocate the Consent Judgment Award Between Covered and Non-Covered Damages**

Even if the Bradfields could demonstrate that some of their damages were covered by the Winfree Policy, Mid-Continent would still not have any duty to indemnify, and there would be no insurance coverage, due to the Bradfields' failure to allocate the amount of the MSA and Consent Judgment between covered and uncovered damages.  See Trovillion Constr. & Dev., Inc. v. Mid-Continent Cas. Co., 2014 WL 201678 at * 8 (M.D. Fla. Jan. 17, 2014).

The MSA lists the agreed upon damages to the Bradfield Home as a lump sum of $671,050.00.  There is no breakdown of this amount anywhere in the MSA, or in the Consent Judgment which incorporated and adopted this amount in toto.[36]  Instead, the MSA attached and incorporated the complaint in the Underlying Case and the Endeavour Report.  Those documents however, would clearly subject Winfree to liability beyond the scope of the Winfree Policy.  For example, the Endeavour Report includes damages to the roof, which was admittedly constructed by a subcontractor that was the subject of a separate lawsuit, resulting in a settlement in full, as well as damages to the pool, decking, and pool bath, all of which was installed by a separate entity years after Winfree completed its construction.  The Report also includes

---

[36]The MSA references an "Exhibit B," however no such document has ever been submitted to the Court and neither Mr. Higo, Mr. Winfree, nor the Bradfields were able to identify such a document.  See Doc. 122-7, p. 75; Doc. 122-8, p. 189; Doc. 122-10, pp. 191-92; Doc. 122-11, pp. 73-74.

damages for mold, which is clearly excluded from coverage, and as discussed in detail above, damages for the replacement of improper and/or defective materials, which are also excluded from coverage.  Thus, the damages in the MSA and Consent Judgment require categorical allocation, but the MSA and the Consent Judgment ignore this necessity completely.  See Doc. 2, Exs. H, I.

Florida law clearly requires the party seeking recovery – in this case the Bradfields – to allocate any settlement amount between covered and noncovered claims.  See Keller Indus., Inc. v. Employers Mut. Liab. Ins. Co. of Wis., 429 So. 2d 779, 780 (Fla. 3d Dist. Ct. App. 1983) (the party claiming coverage has the burden "to apportion damages and show that the settlement or portions thereof, represents costs that fell within the coverage provisions of the policy" and "an unjustified failure to defend does not require the insurer to pay a settlement where no coverage exists."); Jones v. Holiday Inns, 407 So. 2d 1032, 1034 (Fla. 1st Dist. Ct. App. 1981) ("the party seeking indemnification had the burden of showing entitlement to indemnification and failed to request the use of a special verdict, the use of a general verdict should stand as a bar to indemnification."); Universal Underwriters Ins. Co. v. Reynolds, 129 So. 2d 689, 691 (Fla. 2d Dist. Ct. App. 1961) ("where a judgment includes elements for which an insurer is liable and also elements beyond the coverage of the policy, the burden of apportioning these damages is on the party seeking to recover from the insurer.... That it is impossible for the plaintiff to do so in the case at bar does not change the basic predicament in which [plaintiff] finds himself."); Trovillion, 2014 WL 201678 at *

8 ("Inability to allocate precludes recovery."); American Cas. Co. of Reading Pennsylvania v. Health Care Indem., Inc., 613 F. Supp. 2d 1310, 1320 (M.D. Fla. 2009) ("Where the judgment includes elements for which an insurer may be liable as well as elements beyond the coverage of the policy, the burden of apportioning the damages is on the party seeking to recover from the insurer.") (quoting Guarantee Ins. Co. v. Gulf Ins. Co., 628 F. Supp. 867, 870 (S.D. Fla. 1986)) (additional citations omitted).

The Bradfields first argue in response that they have properly allocated all damages simply because the MSA states that all of the $671,050.00 were reasonable and necessary costs to repair the damages and latent defects to the Bradfield Home. This argument, a classic case of hoisting yourself on your own petard, runs afoul of the substantial body of caselaw listed above.  At all times, the Bradfields had the burden of establishing that the damages requested were all covered under the terms of the Winfree Policy, and neither the MSA nor the Consent Judgment accomplish that task. To the contrary, they have clearly rolled into a lump sum judgment categories of damages that are not covered.

The Bradfields next argue that the $671,050.00 lump sum is capable of allocation by referring to two separate estimates from Mr. Swidler, the estimate from Mr. Clark, the estimate from Mr. Lougheed, and Mr. Swidler's deposition testimony. See Doc. 71, pp. 14-15.  However, a review of all of these materials, both separately and in combination, only confuses the matter and demonstrates the importance of the Bradfields' failure to allocate their claimed damages.

Mr. Swidler prepared two estimates for the Bradfields. The first, dated December 13, 2012, is for the total amount of $671,050.00, the exact amount of the damages listed in the MSA and Consent Judgment. (Doc. 64-14). Notably, the Bradfields' counsel testified at his deposition that this December 13, 2012 estimate was the "Exhibit B" referenced in the MSA. (Doc. 122-5, p. 97). This estimate, however, merely lists 44 categories of repair work, and with the exception of plumbing fixtures ($4,286.00), electric fixtures ($6,000.00), appliances ($8,100.00), and pavers ($3,000.00), the estimate nowhere breaks down the total amount of damages by category. Moreover, many of these categories of purported damages (such as replacing drywall, the a/c handler, stucco, and the roof), constitute the repair or replacement of defective materials which are excluded from coverage. This estimate does not come close to satisfying the Bradfields' burden of allocating damages between covered and uncovered amounts.

Mr. Swidler's second estimate, dated December 14, 2012, suffers from the same flaws. This estimate is in the amount of $787,494.00, and specifies dollar amounts for a management fee ($91,237.00), landscaping fees ($20,000.00), moving and living expenses for the Bradfields ($68,000.00), and an increased paver replacement fee of $7,000.00. (Doc. 68, Ex. C). The remaining bulk of the estimate is again stated as a lump sum, and includes the same 44 categories of damages listed in the prior estimate.

The Bradfields further argue that Mr. Swidler's estimates can be broken down into categories of damages if the Court turns to Mr. Clark's December 6, 2012 estimate,

and a separate estimate from Mr. Lougheed.   But none of these documents were referenced or attached to the MSA or Consent Judgment and cannot now be treated as a part of that judgment – a judicial determination made without the benefit of those documents.  The total amount of Mr. Clark's estimate is $486,464.50, and the amount is broken down into categories of damages (Doc. 64-18).  The total amount of Mr. Lougheed's estimate is $279,654.00 and it too is broken down into damages categories, some of which overlap Mr. Clark's categories. (Doc. 77, pp. 3-4).  And the Bradfields have submitted a document prepared by Mr. Swidler entitled "Calculation of Estimates" that explains which portions of Mr. Clark's (all) and which portions of Mr. Lougheed's (stucco, balcony, unforeseen costs and 10% profit), along with a $32,185.50 mold remediation fee, were combined to reach the $671,050.00 estimate. (Doc. 73, pp. 48-49).

Even if these extringent materials could be used to satisfy the Bradfield's burden of allocating the total MSA and Consent Judgment award between covered and excluded/noncovered damages, upon closer inspection they do not.   Mr. Clark's estimate lists categories of work, but these categories themselves are identified in the broadest of terms, using words such as: "hardwood/removal," "carpeting/removal," "remove damage/drywall," "fixtures," "plumbing," "roofing," "windows," "insulation," "drywall," "stucco" without any explanation (Doc. 64-18).  And Mr. Clark testified at his deposition that much of this work was required due to mold, which is clearly excluded from coverage (Doc. 64-16, p. 117).  Mr. Lougheed's estimate suffers from the same

fate.  It lists various tasks to complete for the stucco and balcony work, but then only provides a lump sum for each without any further breakdown.  In other words, neither Mr. Clark's nor Mr. Lougheed's estimates specify which portions of their charges would be for repairs to tangible, non-defective property, and which portions would be for repair or replacement of defective or improperly installed components.

Further complicating matters is that Mr. Swidler's $671,050.00 estimate lists project management fees, moving and living expenses, and landscaping, but does not attribute dollar amounts to these items.  And neither Mr. Clark's or Mr. Lougheed's estimates address these expenses.  Even more confusing, these amounts are included in the December 14, 2012 estimate (Doc. 68, Ex. C, Doc. 73, pp. 48-49), however, upon repeated questioning, Mr. Swidler was not able to explain how he calculated them, or whether they were included in total, or in part, in the $671,050.00 listed on the MSA and Consent Judgment.[37]  (Doc. 83-1, pp. 231-33, p. 50.).  Mr. Swidler also testified at his deposition that there was a $57,000.00 discrepancy between the numbers he used for his December 13, 2012 estimate, and the actual amount that he calculated of $671,050.00, for which he had no explanation (Id., pp. 446-47).  He

---

[37]For example, Mr. Swidler repeatedly stated that he charged a 20% project management fee, but was unable to identify the base number that he used to calculate the 20%.  There is a December 13, 2013 bill from the Endeavour Group listing a project management fee of $97,292.29, which is 20% of the estimate from Mr. Clark (Doc. 83-4).  However, the project management fee Mr. Swidler listed in his earlier December 14, 2012 estimate is for $92,237.00 (Doc. 68, Ex. C) and the "Calculation of Estimates" lists a 15% project management fee of $91,237.00.  Mr. Swidler could not explain this discrepancy.  Mr. Swidler also could not explain whether his $671,050.00 estimate included a double charge for stucco work ($6,820.00 listed in Mr. Clark's estimate and $96,500 listed in Mr. Lougheed's) (Doc. 83-1, pp. 226-27).

further testified that he had no explanation for how the final figure for damages listed in the MSA and Consent Judgment was calculated.  (Doc. 122-12, pp. 517-18).  Lastly, and perhaps most damning to the Bradfields' claims, is Mr. Swidler's candid testimony about the contents of his $671,050.00 estimate:

> Q.  With regard to the $671,050 estimate, which is the December 13th, which is at MSI 117 and 118, that, the 671,050, Mr. Swidler, I want to make sure I'm correct, that estimate includes the cost to, for example, to repair and replace defective work, correct?
>
> A.  Yes.
>
> Q.  And it also includes the cost to repair and replace damage caused by defective work, correct?
>
> A.  Yes.
>
> Q.  And since you did not prepare the estimate but relied upon the estimate that Derrell [Mr. Clark] prepared, you don't know what part of the 671,050 refers to the cost to repair defective work as opposed to the cost to repair damage caused by defective work, correct?
>
> A.  Correct.

(Doc. 81-10, p. 49).  Mr. Clark also testified that his estimate contained amounts to repair and replace defective work such as improperly installed windows (Doc. 64-16, p. 221-22).  Mr. Lougheed's estimate similarly includes amounts for defective installation and/or use of improper materials, such as the installation of a midwall weep required by building code (Doc. 77, pp. 3-4, Doc. 64-20, pp. 124-27).

In sum, the Court is faced with an MSA and Consent Judgment that merely list lump sum damages and which clearly include damages not covered by the Winfree

Policy.   In an attempt to satisfy their burden of allocating this lump sum between covered and non-covered damages, the Bradfields would have this Court review numerous estimates, listing nearly 50 different categories of damages and repair work, and attempt to reconcile these varying amounts to determine not only what types of work would be covered property damages under the Winfree Policy, but what amounts should be attributed to each such category.   The Court will not engage in such futile work.[38]   The Bradfields have failed to meet their burden, and this inability to allocate damages precludes recovery.   Trovillion, 2014 WL 201678 at * 9.   Mid-Continent is entitled to summary judgment.[39]

### C.   Is the Consent Judgment Unreasonable and/or Tainted by Bad Faith, Fraud, or Collusion?

Because the Court has now determined that Mid-Continent bore no duty to defend or indemnify Winfree in the Underlying Case, and that the amount of damages in the MSA and Consent Judgment were not properly allocated amongst covered an noncovered damages, the Court need not consider whether the Coblentz agreement is reasonable and was made in good faith.   See Stephens v. Mid-Continent Cas. Co.,

------

[38]See e.g. American Pride, 534 Fed. Appx. at 928 ("We also reject American Pride's argument that the jury, even if it found the settlement to be unreasonable, should be allowed to fix a reasonable settlement amount.").

[39]Mid-Continent has also argued that the $20,333.55 in attorney's fees and $4,724.45 in costs listed in the MSA and Consent Judgment are not covered damages.   Because the Court has determined in this Order that the MSA and Consent Judgement are not valid under Florida law, and that Mid-Continent did not have a duty to defend Winfree, the Court need not reach the issue of fees and costs.

915 F. Supp. 2d 1320, 1334 (S.D. Fla. 2013) (declining to address reasonableness and good faith after finding no coverage under insurance policy).   Nonetheless, in the interest of finality, the Court will decide the issue as an alternative basis for the resulting judgment to be entered.

When an injured party wishes to recover under a <u>Coblentz</u> agreement, "[t]he claimant must 'assume the burden of initially going forward with the production of evidence sufficient to make a *prima facie* showing of reasonableness and lack of bad faith, even though the ultimate burden of proof will rest with the carrier.'" <u>Chomat</u>, 919 So. 2d at 538 (quoting <u>Steil</u>, 448 So. 2d at 592).   The courts impose good faith and reasonableness requirements in these cases due to the risk that the "settlement of liability and damages" in a settlement agreement "may have little relationship to the strength of a plaintiff's claim" where the insured may never be obligated to pay and has little to lose if he stipulates to a large sum with the plaintiff.   <u>Steil</u>, 448 So. 2d at 592. <u>See</u> <u>also</u> <u>Bond Safeguard Ins. Co. v. National Union Fire Ins. Co. of Pittsburgh</u>, 2014 WL 5325728 at * 9 (M.D. Fla. Oct. 20, 2014) ("What <u>Coblentz</u> does not do is authorize the insured to indiscriminately load the carrier's wagon with bricks of damage that no reasonable person would expect as consequences of the underlying claim.").

In Florida, the "test as to whether a settlement is reasonable and prudent is what a reasonably prudent person in the position of the defendant [the insurer] would have settled for on the merits of plaintiff's claim."   <u>Home Ins. Co. v. Advance Machine Co.</u>, 443 So. 2d 165, 168 (Fla. 1st Dist. Ct. App. 1983) (citations omitted).   Objective and

subjective factors are considered, "including the degree of certainty of the tortfeasor's subjection to liability, the risks of going to trial and the chances that the jury verdict might exceed the settlement offer." Home Ins. Co., 443 So. 2d at 168. "[P]roof of reasonableness is ordinarily established through use of expert witnesses to testify about such matters as the extent of the defendant's liability, the reasonableness of the damages amount in comparison with compensatory awards in other cases, and the expenses which have been required for the settling defendants to settle the suit." Chomat, 919 So. 2d at 538. Bad faith also may be established by evidence of the absence of any "effort to minimize liability." Mid-Continent Cas. Co. v. American Pride Bldg. Co., LLC, 534 Fed. Appx. 926, 928 (11th Cir. 2013); Taylor v. Safeco Ins. Co., 361 So. 2d 743, 746 (Fla. 1st Dist. Ct. App. 1978).

In this case, the Bradfields have listed four potential experts: Michael Swidler, Cecil Clark, Allan Lougheed, and Hidalgo Rangle. None of these experts testified or gave an opinion as to: (1) the reasonableness of the settlement in comparison with awards in other cases; (2) the lack of bad faith in creating and executing the settlement; (3) whether the Bradfields had a high probability of success in the Underlying Case; (4) whether the Bradfields' claims were sufficiently strong to justify payment of all damages demanded; or (5) the expenses that would have been required to settle the suit versus continuing to litigate. Rather, these purported experts limited their testimony to the reasons for the damage to the Bradfield Home, and the extent and amount of the damages claimed. See Docs. 72-73, 77, 98, 123, 130. In the absence of any expert

testimony relevant to the question of reasonableness, the Court will instead focus on the plethora of other undisputed facts which are more than sufficient to show that the MSA and Consent Judgment are not reasonable under Florida law.[40]

In this case, it is at least arguable that the Bradfields have made out a *prima facie* case of reasonableness by virtue of the fact that the MSA was approved by a licensed certified state mediator, and the Consent Judgment was approved by a state court. Cf. State v Davis, 203 So. 2d 160, 162 (Fla. 1967) ("Ordinarily, a final judgment of a court of record is accorded the sanctity of presumed validity when tendered in evidence in another court."). The burden then shifts to Mid-Continent to produce evidence of a lack of reasonableness and/or lack of good faith. The undisputed evidence more than satisfies that burden.

First, if the Court adopts the Bradfields' position that "Exhibit B" to the MSA is Mr Swidler's December 13, 2012 estimate, then it is clear that the $671,050.00 in damages encompasses sums that are simply not covered by the Winfree Policy (such as replacing improper materials).[41] The damages also include replacing the roof, however, the Bradfields settled that claim with Pride USA in November 2013, and the Bradfields have made no attempt to remove any claims for the roof from the relief

---

[40]The Court notes that Mid-Continent has proffered an expert, Lynn E. Wagner, on these very issues. However, the Court need not and will not consider Mr. Wagner's testimony and opinions as she is also the subject of a Daubert challenge from the Bradfields. (Doc. 68).

[41]The judgment might be in a reasonable amount as to Winfree, who agreed to it subject to the Coblentz limitation on his own liability, but it is unreasonable as to Mid-Continent at whom it was aimed as the source of payment.

requested from Mid-Continent.  Moreover, the failure to allocate the $671,050.00 between covered and noncovered damages further suggests a lack of good faith.

The Court is also concerned about certain statements contained in the MSA that strongly suggest collusion.  First, the MSA states that Horgo Signature was an insured of Mid-Continent even though it is undisputed that Mid-Continent never issued an insurance policy to Horgo Signature (and at the time the MSA was executed, nor at any time since then, has anyone produced an insurance policy from Mid-Continent covering Horgo Signature).  Second, the MSA clearly was drafted in an attempt to avoid the "CG2294:  Damage to Work Performed By Subcontractors On Your Behalf" endorsement, which is part of each of the Winfree Policy renewals.  The first Winfree Policy, which expired on May 23, 2006, did not contain this endorsement, thus for any damages that occurred prior to May 23, 2006 that were caused by subcontractors, coverage would still exist.  Notably, the MSA states "[a]ll work related to the Latent Defects . . . was completed on or before May 20, 2006."  (Doc. 2, Ex. H, p. 3).  This statement in the MSA is curious to say the least in light of Mr. Winfree's inability to testify as to the date that construction was completed, and the Lake County building records which disclose that construction was ongoing through December 2006.

More persuasive, however, is the fact that Winfree made no attempt to minimize the amount of the Consent Judgment.  To the contrary, both Mr. Higo and Mr. Winfree candidly and consistently testified that they did not know the extent of the damage to the Bradfield Home, or the amount and types of work that were required to repair the

damage.[42]  They also had no idea how the $671,050.00 in damages was calculated;

and were not aware of the categories of damages that were included in that amount.[43]

Mr. Winfree further testified that neither he nor Mr. Higo participated in the mediation;

they instead sat outside the conference room for hours  while the attorneys supplied

the dollar amounts in the relevant documents.   And while Mr. Winfree did testify on

cross-examination by the Bradfields' counsel that the damages amount was

"reasonable" he testified in further detail that "you could tear the whole house down,

throw it in the garbage and rebuild it" for the amount of the Consent Judgment (Doc.

122-11, p. 62).  Even more damning is Mr. Winfree's admission that from the beginning

of the mediation conference, the parties endeavored to make Mid-Continent liable for

everything:  "I threw [Mid-Continent] under the bus for me, yes.  Just like they throwed

[sic] me under the bus."  (Id., p. 98).[44]

_____

[42]The Bradfields contend that Mr. Higo testified that all of the damages occurred due to Wifnree's poor construction.  (Doc. 71, pp. 9-10).  Unfortunately, the Bradfields did not submit the majority of the portions of Mr. Higo's testimony that they refer to, and the few pages that were submitted (Doc. 122-4, pp. 191-92) clearly show that Mr. Higo's testimony was in response to hypothetical questions and not based on any actual first hand observation of the Bradfield Home.

[43]The Bradfields testified to this same lack of knowledge.

[44]The Bradfields ask the Court to ignore Mr. Winfree's testimony as inadmissible parol evidence that contradicts the express language of a binding contract (the MSA).  Instead, they argue that the Court should find the MSA reasonable and without collusion simply because the MSA says so.  This circular argument is disingenuous.  Mr. Winfree's testimony concerning the mediation conference and his agreement to the MSA is not being used to change the terms of the MSA; rather it is crucial to determining the reasonableness and bad faith prongs of the Coblentz analysis.   Otherwise, insureds could render the entire body of law concerning Coblentz agreements null and void, and make insurance companies liable for clearly excessive and

(continued...)

The Court is further persuaded by the fact that Winfree had six viable affirmative defenses to the Underlying Case, but voluntarily abandoned all of them, as well as its previously filed motion to dismiss.  Instead, Winfree chose not to engage in even the most rudimentary discovery and simply accepted without question the damages numbers provided by the Bradfields.[45]  While not dispositive, the Court notes that Pride USA, the roofing subcontractor, did engage in some discovery and litigation of its case, resulting in a settlement for 60% of the amount the Bradfields now claim in this case as the cost of repairing and/or replacing the roof.[46]

On this record, and in particular based on Winfree's failure to make any attempt to minimize its liability, the conclusion that the <u>Coblentz</u> agreement was unreasonable and/or was reached by collusion and bad faith is compelling.  Thus, even if the Winfree

_____

[44](...continued)
uncovered damages, simply by including a statement in their settlement that it is reasonable and the product of good faith negotiations.  Notably, the Bradfields have not cited to a single case that precluded the admission of oral testimony to support/challenge the reasonableness of a written <u>Coblentz</u> agreement.

[45]The Bradfields counsel argues that the actual amount of damages, as set forth in Mr. Swidler's December 14, 2012 estimate is $787,494.00 (Doc. 68, Ex. C), and that the amount listed in the MSA and Consent Judgment of $671,050.00 represents a 15% reduction in the total liability that Winfree could have been subjected to.  This argument is unpersuasive because: (1) Mr. Swidler's testimony concerning the calculations for the December 14, 2012 estimate were confusing at best; (2) no one could explain how this 15% reduction was reached, even though it is identical to Mr. Swidler's December 13, 2012 estimate; and (3) the Bradfields have not submitted any evidence (such as expert testimony) concerning what Winfree's potential liability would have been at trial.

[46]Mr. Clark  estimated on December 6, 2012 that the roof replacement would cost $53,900, (Doc. 64-18), and the Bradfields settled with Pride USA in November 2013 for $30,000.  (Doc. 64-10).

Policy provided coverage to Winfree in the Underlying Case – and it does not – the entry of summary judgment for Mid-Continent would still be warranted on that additional ground.   See Bond Safeguard, 2014 WL 5325728 at ** 9-10 (finding Coblentz agreement unreasonable where insured did not make any attempt to minimize liability, did not know what damages were included in the judgment, abandoned viable defenses, did not recall any negotiations related to the judgment, and "didn't have any money left anyway.").

## Conclusion

Accordingly, upon due consideration, it is hereby ORDERED as follows:

(1)     Defendant Mid-Continent Casualty Company's Motion to Take Judicial Notice of the Underlying Action's Complaint (Doc. 25) is GRANTED;

(2)     Plaintiffs Joseph Bradfield's and Patricia Bradfield's Amended Motion for Partial Summary Final Judgment for Declaratory Relief Under Count II (Doc. 28) is DENIED;

(3)     Defendant Mid-Continent Casualty Company's Amended Motion for Summary Judgment Regarding Horgo Signature Homes (Doc. 63) is GRANTED;

(4)     Defendant Mid-Continent Casualty Company's Motion for Summary Judgment Regarding Winfree Homes (Doc. 64) is GRANTED;

(5)     The Parties' Motions in Limine to Exclude Expert Testimony (Docs. 68, 83, 88, 130) are DENIED AS MOOT;

(6)     The Plaintiffs' Motions for Ruling on Previously Filed Motion for Partial Summary Judgment (Docs. 81, 146) and the Defendant's Request for Oral Argument (Doc. 106) are DENIED AS MOOT; and

(7)     The Clerk is directed to enter final judgment in favor of Defendant Mid-Continent Casualty Company and against Plaintiffs Joseph Bradfield and Patricia Bradfield as to all claims as set forth in the Complaint (Doc. 2).  The Clerk is further directed to terminate all other pending motions and to close the file.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 10th day of November, 2015.

_____
UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record
             Mari Jo Taylor